STEVENSON
*vs.*
GRAY, &c.

---

## Stevenson *vs.* Gray, &c.

### APPEAL FROM LOGAN CIRCUIT.

Case 23.

PET. EQ.

,17bm193
e109 461

1. It is the general settled rule of law in England, (*Dalrymple vs. Dalrymple,* 2 *Hog. C. R.* 54,) and in most of the states of the Union, especially in Kentucky, that a marriage which is valid by the law of the country where it is celebrated, is to be held valid in other countries in which the parties may be domiciled, though it would have been invalid by the law of the subsequent domicil if it had been there celebrated. Incestuous marriages especially, have, in christian countries, formed exceptions to this rule, where no distinction is taken between lineal ascending and descending. (*Bishop on Marriage and Divorce, sec.* 125, *&c.*)

2. Though the statute of Kentucky directs that license to marry shall issue from the clerk of the county where the female resides, yet if it issue from another county the marriage under such license will not, for that cause, be held invalid.

3. A marriage celebrated in Tennessee, between a nephew and his uncle's wife, not prohibited by the laws of that state, held valid in Kentucky, where the parties were domiciled. A foreign marriage is to be tested by the *lex loci contractus* to sustain it, but not to defeat it.

4. The statute of 1798 was not intended to have any *extra* territorial operation.

5. A marriage between a nephew and his uncle's wife, though against the statute of 1798, cannot be declared void, or so treated, after the death of one of the parties, in a collateral proceeding.

[The facts of the case are given in the opinion of the court.—REP.]

*E. Hise* for appellant—

The question presented for adjudication in this case is whether, under the facts stated in the petition, George W. Gray, as the pretended husband of Sarah G. Gray, has a right to hold, as tenant by courtesy, the lands of said Sarah G. Gray during his own life, against the claim of her heirs-at-law, of whom the plaintiff is one; and to withhold from the heirs of said Sarah G. Gray all the slaves, and increase, which belonged to her at the time of her pretended marriage with the said George W. Gray in the state of Tennessee; and also the estate which the said Sarah inherited during the coverture from her two daughters, who died without issue in her lifetime.

1. By the provisions of the statute of 1798 (2 *Statute Law, page* 1157,) George W. Gray and Sarah G. Gray were wholly incapable of contracting a marriage with each other. To assume such a relation by an actual marriage subjected them to an unlimited penalty; and the courts were required to declare such marriage *null and void* to all intents and purposes. Surely, then, if these parties had executed such a marriage contract in Kentucky, and cohabited as man and wife, the husband, after the death of the supposed wife, could not be entitled to a life estate in her lands as tenant by the courtesy. There is wanting one of the essential ingredients to constitute a tenantcy by the courtesy—that of a legal and canonical marriage. (2 *Christian's Black.* 129.)

2. It is said that this marriage was not absolutely void but only voidable, and not having been so declared by a judicial proceeding in the lifetime of Sarah G. Gray, that it cannot now be done, and, therefore, that the surviving husband is entitled to courtesy in the land, and the absolute right to the slaves and personalty.

This position is regarded as untenable. It has been repeatedly decided by this court that contracts which are against public policy, and prohibited by law, are not merely *voidable* but *null and void*, and having no legal force—as contracts made on the Sabbath—contracts based on illegal consideration, as gaming, bribery, to do an unlawful act, as commit a felony, &c., or to do an act by which a penalty is incurred. (*Carter vs. Leeper*, 1 *Dana*, 261, *and cases there cited.*)

3. These parties, George W. and Sarah G. Gray, domiciled in Kentucky; the property now in contest was here; they pass over to Tennessee where a marriage was solemnized—where such a marriage is not prohibited—this is done to evade the laws of Kentucky; they return to Kentucky and here remain. Will the laws of Tennessee be allowed to control in determining the rights of the parties, especially the right in the real estate? The territorial sovereign has the exclusive right to determine how real estate within its limits shall be acquired—whether by conveyance, devise, or descent. This is one of the attributes of sovereigntry ever regarded. The husband could not, then, so far as the land is involved, its rents, &c., acquire any right through a law of Tennessee which is not given by the laws of Kentucky which he has attempted to evade. A deed executed in any other state will not pass real estate in Kentucky, unless it be in conformity with our laws; and lands cannot be inherited but according to the law of the state where they are situated. (*Cornelius vs. Browning*, 10 *B. Monroe*, 48; *Jones vs. Marable*, 6 *Humphreys' Tenn. Rep.* 118; *Story's Con. Laws*, sections 447–8–9.) In the latter authority it is said that lands cannot be acquired, either by contract or inheritance, or by operation of law, as dower or courtesy, except by such persons and under such circumstances as is allowed by the *lex rei sitae*, or the law of the territorial sovereign. Again: "It has been agreed on all sides, that where there is in the coun-

try *in sitae* a prohibitory law against any such dotal rights, (or rights to courtesy,) and against any contract to create them, the law of the matrimonial domicil cannot prevail." Apply this doctrine to the case in hand: George W. Gray, by a marriage with Sarah G. Gray in Tennessee, which would be unlawful in Kentucky, cannot acquire a courtesy in lands in Kentucky, though it might have been a lawful marriage in Tennessee. The rule is asserted to be universal, that if persons are by the laws of their domicil inhibited from making certain contracts, or made incapable of contracting by reason of minority, lunacy, coverture, or by reason of certain relationship of affinity or consanguinity, that such incapacity attends them wherever the prohibited contract is made, though in another state where such contract may be lawful, and such contract will be held invalid, and will not be enforced in the state where such incapacitated person was domiciled at the time of making the contract. (*Story's Conflict of Law, sections* 61, 65, 66, 67, 68, 73.)

If parties be capable of contracting marriage at the place of their domicil, then an actual marriage in another state, if valid by the laws of the latter state will be held to be valid by the laws of their domicil, although not solemnized according to the laws of their domicil, but in conformity with the law of the place where it took place. But parties who are laboring under a prohibition to marry in the state of their domicil, under a penalty, cannot contract *to* marry, and legally marry, in another state so as to give to the woman a right to dower and the husband to courtesy, or to the slaves and land of the wife situated in the state where the marriage would have been unlawful. Any other conclusion would tend to frustrate the policy of the state

The proposition of law stated in 3 *A. K. Marshall*, 499, though stated in general terms, is not universally true, nor was it necessary to the decision of that case. As the marriage was valid both by the laws of Kentucky and Indiana, it was not in viola-

tion of any law of either state, and no question in respect to either dower or courtesy was raised.

The *Revised Statutes, section* 6, *chapter* 47, *page* 385, takes the true distinction on this point.

The court is referred to the case of *Sneed vs. Ewing and wife,* 5 *J. J. Marshall,* 460 *to* 493. In that case the court said, that slaves, notwithstanding our statute declared them to be real estate, were moveble, and to be regarded as personal estate for many purposes, and distributed in the same way according to the *lex loci domicilia* of the owner wherever he may be at his death. This cannot defeat the claim of the plaintiff in this case to his share of the slaves, as well as of the land, which belonged to his mother at her death, but establishes and confirms that right, as she was domiciled in Kentucky at the time of the pretended marriage in Tennessee, and afterwards until her death, and so was George W. Gray. So if the law of the domicil shall govern, and not the law of Tennessee, the slaves of the grandmother must, upon her death, revert to her heirs under the statute of descents, and not to George W. Gray, who could not by the law of the domicil be the lawful husband of Sarah G. Gray. And two principal reasons govern in this conclusion: 1. Because the slaves were within. 2. Because the owner lived and was domiciled within the jurisdiction of this state. In the opinion cited, (5 *J. J. Marshall,* 489,) this court said "the statute of Kentucky would have applied to the land even if the marriage had taken place in Indiana," and so would the Kentucky law in that case, as it does in this case. The court, in the same opinion, said : "For although marriage, like other civil contracts, must be regulated by the *lex loci contractus,* yet it is not every marriage which may be valid by the law of the place where it was consummated which will be recognized as legal every where else. Every sovereign state is the conservator of its own morals, and may nullify incestuous or polygamous contracts." It is admitted that marriages in other

states will be regulated by the laws of such states in respect to the rights and privileges of the parties as to their real and personal estate within its jurisdiction, and personal estate without its jurisdiction. With such qualification the position of the court is correct, but not where the parties are domiciled and the property lies in Kentucky, and the parties evade the laws of Kentucky, and go to Tennessee to marry, when the marriage in Kentucky was prohibited under a penalty, and when the parties remain domiciled in Kentucky until their death, and the courts of Kentucky are called upon to determine the rights of property between the surviving party and the heirs of the deceased party.

According to the exposition of the common law in the case in 5 *J. J Marshall, supra,* George W. and Sarah G. Gray were both laboring under civil disability to intermarry, by an express statute, and if the relationship subsisting did not place them under a civil disability to marry by the common law, or the Levitical law, or the canon law of the church of Rome, then the common law has been repealed and changed by a statute of Kentucky. But if marriage within the Levitical degrees was not absolutely void by the common law, why was it not? Because there was no law passed by the British Parliament, or established by judicial precedent in England, which made such connections penal, and as a matter of public policy or morality prohibited them, as has been done here, and by the Levitical law of the Jews, and the canonical laws of the papal hierarchy, was not allowed in England to have the effect of making such marriages absolutely void. But if the English Parliament had passed such a law, then such marriages would have been void by the laws of England as well as by our law.

The court is referred to the following sections in *Story's Conflict of Laws,* 180 *to* 189, *and* 192 *to* 199, *on pages* 155 *to* 167.

By the laws of Tennessee no clerk is authorized to issue a marriage license unless the female resides in the county from which the license issues, (*Haywood & Cobb's Digest of the Laws of Tennessee*, 219,) under the penalty of $250. In the case of *Bashaw vs. State of Tennessee, Yerger's Reports*, 185, it is held that where a contract is prohibited by law, it is null and void, though the law should not declare it so, and that the common law in relation to marriages was repealed in Tennessee, and unless contracted and solemnized in conformity with their statutes is void, and in that case that it was void because solemnized by a justice of Sumner county instead of Davidson county.

It is not the law of Kentucky, and has not been since the act of 1798, that the *lex loci* governs marriage contracts in all cases, or that marriages within the Levitical degrees are not void, but voidable only, and if not avoided by judicial sentence, all the rights growing out of that relation still remain ; but the common law stands repealed by that act, and such doctrine never could have prevailed in England if there had been in force there a statute similar to ours. It cannot be that the laws of Tennessee are to govern the marriage in this case, and control the course which property in Kentucky is to pass.

*J. R Underwood* for appellees—

1. After a lapse of twenty years the court should not tolerate a bill to annul a contract which was not *mallum in se*, but only *mallum prohibitum*. Besides, the contract in this case sought to be nullified, was not made in Kentucky, but in Tennessee where it was not prohibited. It is contended by the appellant that the clerk in Tennessee who issued the license, issued it in violation of law, because the parties to the intended marriage were not *residents* of Tennessee. Such an error of the clerk in failing to comply with the directions of the statute cannot invalidate the marriage. It is but directory to the

clerk, and for his failure to comply he may be punished, but it cannot affect the validity of the marriage. *Dumarsly vs. Fishly*, 3 *Marshall*, 270, is decisive of this question.

But it is denied that there was any violation of the laws of Tennessee by the clerk issuing the license. The parties were in Tennessee when the license issued, and there they were married; though they were not domiciled, they *resided* there for the time being, though they may not have been citizens.

The marriage in Tennessee was lawful. Mrs. Gray had the fee simple in her property. She had the right to encumber it by any lawful contract—by an estate of courtesy in behalf of her husband, or any other way—and the chancellor ought not, after so great a lapse of time, no one complaining, to interfere. (See *Fenwick vs. Macey's executor*, 1 *Dana*, 276.) Moreover, the father and mother of the petitioner were competent to institute proceedings to nullify the marriage if it had been practicable to do so.

2. The chancellor has no jurisdiction in this case. The 9th section of the statute regulating the solemnization of marriages (2 *Stat. Law*, 1157,) is relied upon by appellant. That section prescribes punishment by fine upon the man who marries "his uncle's wife," and also upon the wife, and directs the attorney for the district, or county, to indict the parties, and, when convicted, the court is to render judgment for the fine, and, moreover, shall declare such marriage *null and void* to all intents and purposes; and if the court see fit, bond and security may be required of the parties that they will not cohabit thereafter.

This is a penal proceeding pointed out by the statute which must be strictly pursued, and there is no authority to declare the marriage null and void without the verdict of a jury after an indictment. The chancellor here is called upon to declare a marriage null and void, without any prosecution or verdict of a jury, and that, too, after a lapse of twenty years,

and after the death of one of the parties to it. The authority of the chancellor is denied.

3. The statutes of Kentucky have nothing to do with this case. The marriage took place in Tennessee, and the *lex loci contractus* governs the case; so this court decided in the case of *Dumarsley vs. Fishley, supra*, and *Sneed vs. Ewing and wife*, 5 *J. J. Marshall*, 450. The federal constitution secures to the citizens of Kentucky the same right to make contracts in that state as the citizens thereof. The marriage of Mrs. Gray with George W. Gray, being lawful in Tennessee, is lawful everywhere else.

The correctness and constitutionality of the doctrine suggested in *Sneed vs. Ewing and wife*, is doubted—"that marriage must be regulated by the *lex loci contractus*, yet every marriage which was valid by the laws of the place where consummated is not necessarily legal everywhere else. Every sovereign state is the conservator of its own morals, and therefore may nullify incestuous or polygamous contracts." The error of this position, if it be erroneous, consists in assuming that the state of Kentucky is sovereign, and can constitutionally abrogate contracts of any kind lawfully entered into in any other state. No state, composing one of the United States, is *sovereign* over contracts lawfully entered into either within its own jurisdiction or limits, or within the jurisdiction of any one of the United States; every state is restricted on this subject by that clause of the federal constitution which declares that no state shall impair the obligation of contracts.

The consequence of the power to nullify a marriage contract might be to bastardize the issue of parents lawfully united in matrimony in one state and destroy the right of such issue to inherit property situated in another state.

The provision of the Revised Statutes, page 385, can have no operation in this case. It cannot be retroactive and operate upon marriages consummated more than twenty years ago. There is a distinc-

tion, moreover, in the provisions of the act of 1798, (*Statute Law.* 1157,) and the Revised Statutes, page 384. The act of 1798 does not declare a marriage between nephew and uncle's wife void. It makes such a marriage a penal offense, prescribes a punishment, directs a mode of procedure in order to convict the offenders, and when convicted, as a consequence resulting from the conviction, the court is to declare the marriage *null and void.* It is the sentence of the court in this case which makes the marriage void. Not so by the provisions of the Revised Statutes. That statute declares marriages within certain degrees of kindred incestuous and void, prescribing no trial and conviction.

4. The act of 1798, so far as marriage between nephew and uncle's wife having been repealed, and such a marriage now being lawful, it is insisted that the chancellor ought not to entertain jurisdiction to annul such a marriage, even if it had taken place in Kentucky under the law of 1798. Conceding to the state the right to regulate its own morals, surely we should not, upon the pretence of upholding morals, set aside a marriage contract which if now made would be regarded as perfectly legal and moral, because in days past we may have considered it otherwise. The chancellor's morals should move *pari passu* with the law. The change of the law should be regarded as legal sanction of the marriage between George W. and Sarah G. Gray.

5. The laws of England, and of several of the states of the Union, sustain the views taken of this case. The court is referred to the recently published work of *Parsons on Contracts*, sec. 7, *vol.* 2, *p.* 104. The English rule is, that marriages valid at the place where contracted, are valid everywhere. To this rule there are exceptions, according to Judge Parsons, and he refers to the cases at page 109 He says "that the fact that the parties went abroad for the purpose of contracting marriage which would be illegal at home, ought, it might seem, to destroy the

validity of the marriage at home ; but the contrary doctrine appears to have been held and to be established in England and in this country." The cases cited in the note fully sustain the text. The court is referred to notes at page 108, particularly the latter part of it in which the distinction is taken between *civil* and *canonical* disabilities, and where the rule is laid down, "that for civil disabilities, such as prior marriage, &c., the marriage may be declared, either before or after the death of the parties, or either of them, to have been void from the beginning ; but for canonical disabilities, only during the lives of both, and canonical disabilities are said to be consanguinity and affinity within certain corporeal affinities." Again : "Incestuous marriages are not void at common law, but only voidable, and voidable during the lives of the parties." (See, also, *Story's Conflict of Laws, chapter 5, sections* 123 *to* 124, *page* 220.)

Chief Justice MARSHALL delivered the opinion of the court:                    July 1.

In December, 1854, this petition in equity was filed in the Logan circuit court, in the name of Hugh Stevenson, suing by M. W Stevenson, his guardian, against George W. Gray, senior, and George W. Gray, junior, and Preston R. Gray, the two last named, who were made defendants by amendment, being the children of George W. Gray and Sarah G. Gray, deceased, the grandmother of the plaintiff, and former wife of Joseph Gray, their grandfather. The object of the petition is to recover a portion of certain estate, real and personal, which the plaintiff claims as one of the heirs of his grandmother, Sarah G. Gray, in right of his deceased mother, one of her daughters by the said Joseph Gray, her deceased husband, but which it is alledged is claimed and held in possession by the defendant, G. W. Gray, senior, in his pretended right as husband of the said Sarah G. Gray, in virtue of a marriage celebrated between them in the state of Tennessee, about the 10th day

of August, 1830. This marriage is alledged to have been illegal and void, and to have been ineffectual to vest in the said G. W. Gray any right as husband, because he was the nephew, by consanguinity, of Joseph Gray, the deceased husband of said Sarah G.; and by the laws of this state, in which the said G. W. and Sarah G. Gray, before and at the time of their pretended marriage were residents and had their domicil, and so continued afterwards until the death of said Sarah G., a marriage between persons sustaining this relation was prohibited. And it is charged that the said parties being residents of Logan county in this state, there engaged themselves to marry, and went temporarily to Robinson county in the state of Tennessee, with the design and purpose of evading the laws of Kentucky, by consummating, beyond its limits, their illegal engagement; and that immediately after the rites of marriage were performed in Tennessee, they returned to their residence in Kentucky, where the property sued for was then and is still situated. It is also charged that the said pretended marriage was not lawful as performed in Tennessee, because, by the laws of that state, a license authorizing a marriage can only be issued by the clerk of the county in which the female party resides, which, though recited in the license, was not true in the present case. And the plaintiff, admitting that the defendants, G. W. Gray, jr., and Preston R. Gray, children of said Sarah G., by her pretended husband G. W. Gray, sr., are entitled to portions of said estate, pray for a division, distribution, &c.

The defendant G. W. Gray, sr., demurred, and upon the demurrer the petition was dismissed. In this state of case the facts alledged in the petition are to be taken as true, and such as bear upon the question of the validity and legal consequences of the marriage have been substantially detailed, except that, although the petition does not state the time at which Sarah G. Gray died, it may be infer-

red that she survived her daughter, Massie R., whose will was dated in 1847, and was admitted to probate in ———, from which it is to be assumed that G. W. and Sarah G. Gray lived together as husband and wife for many years, during which two children were born, and G. W. Gray enjoyed all the rights of a husband, with respect to the person and property of the plaintiff's grandmother.

This case, therefore, presents the very serious and, in this court, novel question, whether at this late period, when one of the parties to the marriage is dead, when more than twenty-four years had elapsed from its celebration before it was impeached, and when the law itself which is relied on as making the marriage void has been repealed, and such marriages can no longer be deemed unlawful, the aid of the chancellor can be successfully invoked to declare the marriage thus sanctioned by time and the acquiescence of all concerned and of the community, to have been absolutely void, and to annul or disregard all rights claimed under it by the surviving party.

The objection to the marriage is founded on the 9th section of the act of 1798, (2 *Statute Law*, 1157,) which is as follows: "If any person shall marry within the following degrees, that is to say, if the son shall marry his mother or step-mother, or if the son shall marry his aunt, being his father's or his mother's sister, or marry his uncle's wife, or the father shall marry the son's wife, &c., &c., every person so unlawfully married shall be separated by the definitive sentence or judgment of a district court or court of quarter sessions ; and the attorney for the district or county, upon complaint being made to him of any such marriage, shall file an indictment against such persons, and upon conviction by due course of law, they, or any of them, shall be fined at the discretion of a jury, and the court shall proceed to give judgment, and, moreover, shall declare such marriage null and void to all intents and purposes ; and if the court see fit, may cause the parties so

separated to give bond, with sufficient security, that they will not cohabit hereafter, in such penalty as the court shall judge reasonable: Provided, always, that nothing herein contained shall be construed to render illegitimate the issue of any marriage so annulled."

On the side of the plaintiff it is contended, that the parties having been domiciled in Kentucky, and having gone into Tennessee, not with a view of residing there, or changing their domicil, but for the single purpose of evading the laws of Kentucky by a marriage celebrated outside of her territorial limits, within which they immediately returned, and continued to reside with their property, it would be giving effect to an obvious fraud upon the laws of this state, and in derogation of its sovereignty over its own citizens and their rights and relations, to determine, and especially with regard to property situated from first to last in this state, that if the marriage was valid according to the laws of Tennessee, where it was celebrated, it must also be deemed valid by our law, although in direct violation of its mandates. And it is insisted that by virtue and operation of the 9th section of the act of 1798, as above quoted, the marriage of G. W. Gray with his uncle's widow should be deemed utterly void, both on the ground of being prohibited under a penalty, and on the ground of being expressly declared or made void.

It is contended on the other side, that as the act of 1798 does not pretend to regulate marriages in other states, even between citizens of Kentucky, and as it is the law in Kentucky, as in almost all other christian or civilized countries, that a marriage valid by the law of the place or country where it is celebrated, is to be deemed valid everywhere; this marriage having taken place in Tennessee, where it was lawful, its validity cannot here, any more than there, be impeached on the ground of the particular motives which may have induced the parties to choose that

as the place of its celebration ; but that the marriage in Tennessee not having been subject to the laws of Kentucky, nor in violation of any law of Tennessee, was at the time and place of its celebration a valid marriage, and is everywhere entitled to the character and consequences of a valid marriage, even if it would have been invalid if celebrated in Kentucky. But it is moreover, contended that even if the marriage had been celebrated in Kentucky, it would not, by the mere force and operation of the statute of 1798, have been absolutely and *ipso facto* void, but would at most have been subject to be avoided in the proceeding and by the tribunal authorized by the statute.   And that being in effect not void, but voidble only, and not having been avoided in the manner prescribed, and in the lifetime of both of the parties, it cannot now be annulled, or even treated as void, in this collateral proceeding after the death of one of the parties, and after the marriage had been sustained before and by the community for so great a length of time, that at least the court of equity should not not make itself the instrument of such a result.

The question whether the *lex domicilia rei sitae* shall, either on the ground of superior intrinsic authority, or of the alledged fraud in attempting to evade it, prevail over the *lex loci contractus*, chosen by the parties for the consummation of a contract which they could not lawfully enter into in the country of their domicil, is one on which there has been a diversity of opinion among writers and judges.   And there are few subjects on which there has been exhibited more refinement and subtlety of distinction than on the various questions pertaining to the relation and *status* of marriage, and to the consequent rights as dependent simply upon marriage, or upon any accompanying agreement of the parties, or upon the place of marriage or of domicil prior and subsequent.   It is, however, understood to be the settled general rule of law in England, and in most, or all, of the United States, and especially in Kentucky, that a

1. It is the general settled rule of law in England, (*Dalrymple vs. Dalrymple,* 2 *Hog. C. R.* 54,) and in most of the states of the Union, especially in Kentucky, that a marriage which is valid by the law of the country where it is celebrated, is to be held valid in other countries in which the parties may be domiciled, though it would have been invalid by the law of the subsequent domicil if it had been there celebrated.   Inces-

tuous marriages especially have, in christian countries, formed exceptions to this rule, where no distinction is taken between lineal ascending and descending. (*Bishop on Marriage & Divorce, sec.* 125, *&c.*)

marriage valid by the law of the country where it is celebrated, is to be held valid in other countries in which the parties may be resident or domiciled, though it would have been invalid by the law of the subsequent domicil if it had been originally celebrated there. Cases of polygamous or incestuous marriages are, in christian countries, established exceptions to this rule. But with respect to incestuous marriages, the exception holds good with respect to such only as being manifestly contrary to the law of nature, and subversive of the good order of society, are alike condemned by the common sentiment of all civilized, or at least of all christian nations. As between lineal ascendants and descendants, this condemnation practically considered makes no discrimination, founded on nearness or remoteness of degree, but in the collateral line it goes no farther than to prohibit marriages between brothers and sisters. By a statute of Virginia, the marriage of a man with his deceased wife's sister was declared or deemed to be unlawful, but such a marriage taking place in another state, where it was lawful, would surely not be affected by the penalties or other consequences denounced by this statute, if the parties should subsequently remove to the state of Virginia; and even if it had taken place in Virginia between parties resident in that state, who afterwards, before any proceeding to annul it, removed to another state where there was no such prohibition, it would be the province of this latter state to determine what effect should be given to the prohibitory *law* of Virginia. And we think it is not to be doubted, that if by that law the marriage was voidable only, and not absolutely void, it must be held valid in the new domicil, if it had not been avoided in Virginia, and at any rate that no court in Kentucky could annul such a marriage, or treat it as void, unless expressly commanded or authorized to do so by a statute of Kentucky.

There could not be a stronger illustration of the diversity of opinion, proving that there is no absolute or universal law of nature prohibiting marriage between the remoter degrees of collateral kindred, than will be found in a comparison of the Virginia statute of 1788, the one just alluded to, and the Kentucky statute of 1798, which, though evidently founded upon it, omits several of the cases denounced by it. And although the case of marrying an uncle's wife (or widow) is enumerated among the unlawful marriages in our act of 1798, it is, with other cases, omitted in the Revised Statutes of 1852. (*Revised Statutes, page* 384.) This marriage, therefore, although in view of our statute in force at its date, it may, if celebrated here, have been technically incestuous, did not come within the exception of marriages incestuous by the law of nature, and such a marriage taking place now would not be technically incestuous.

If, as alledged in the petition, the law of Tennessee authorized a marriage license to be issued only by the clerk of that county in which the female resides, this is substantially the provision contained in the 8th section of our own statute of 1798; and we cannot suppose that the statute of Tennessee, any more than our own, intended to prohibit all marriages in that state unless the female party were in the full sense a resident of one of its counties, or that a marriage lawful in all other respects, would, if celebrated there, be deemed invalid by her laws upon the single ground that the female either did not reside in any county of the state, or that she did not reside in that county in which the license was issued. If such a result could not be otherwise avoided, we suppose it might be, at least in a question upon the validity of the marriage, by considering the female as being at the time residing in the county in which she then in fact was, as has been done in this court to sustain the acknowledgment of deeds. In any view, these directory provisions, though prohibitory

2. Though the statute of Kentucky directs that license to marry shall issue from the clerk of the c'ty where the female resides, yet if it issue from another county the marriage under such license will not, for that cause, be held invalid.

STEVENSON
*vs.*
GRAY, &c.

3. A marriage celebrated in Tennessee, between a nephew and his uncle's widow, not prohibited by the laws of that state, held valid in Kentucky, where the parties were domiciled. A foreign marriage is to be tested by the *lex loci contractus* to sustain it, but not to defeat it.

and even penal with respect to the officers, have not been regarded as affecting the validity of a marriage otherwise legal.

We take it, then, that there being no impediment by the laws of Tennessee to the marriage of these parties, the marriage was there lawful and valid, and never could have been impugned in that state, either by the fact that it would have been unlawful in Kentucky, in which the parties were domiciled, or by the suggestion that they had left their own state for the purpose of evading the prohibition of its laws, and availing themselves of the permission of the laws of Tennessee. As the prohibitory law of Kentucky would have had no force in Tennessee, the marriage in the latter state must there have created the lawful relation or *status* of marriage, by which the parties were in law and in fact lawful husband and lawful wife to each other in the state of Tennessee, so soon as the marriage was performed, and continued to be, so long as they remained, and would have been so if, at any time before an actual divorce, they had returned to that state. And so, if immediately after the marriage they had gone through the other states, and even to Europe, intending all the time te return to Kentucky, they would have been lawful husband and wife in every place, at least in every country where the common law prevails, because it is a part of that law that being lawful husband and wife at the place of marriage, they continue to be so wherever they may be. In the case of *Dalrymple vs. Dalrymple*, 2 *Hogg. C. R.* 54–58, Lord Stowell, assuming that in an English court the marriage must be adjudicated according to the English law applicable to the case, said: "But the only principle applicable to such a case by the English law, is, that the validity of Miss G.'s marriage rights must be tried by reference to the law of the country where, if they exist at all, they had their origin. Having furnished this principle, the law of England withdraws altogether, and leaves the legal question altogether to the law

of Scotland." And to borrow a significant term from the same eminent judge, the parties gain *a forum* in the place of marriage, and become entitled to the benefit of its laws. The general rule which makes the *lex loci contractus* the test of a foreign marriage, has been departed from to sustain a foreign marriage between British subjects, celebrated according to their own domestic law, though variant from the law of the place, but never for the opposite purpose of avoiding a foreign marriage.

Our statute of 1798 did not attempt nor profess to give any extra territorial operation to its own provisions or principles, even with respect to the marriage of citizens of Kentucky. And if it may be deemed a fraud upon it, and a contempt of the sovereign authority of the state, for its own citizens to withdraw momentarily from her territory for the purpose of assuming and bringing back a relation prohibited by her laws, and with the intention of maintaining that relation openly within her territorial jurisdiction during their joint lives, it would be worthy of consideration by the legislator whether the principles on which the state assumes to regulate marriage may not be better subserved by permitting, even in such case, unless the admitted law of nature be violated, the operation of the general rule which refers the validity of the marriage to the *lex loci contractus*, than by avoiding it for the sake of vindicating the sovereign authority of the state. And although, with regard to other transactions, a court, even without the express mandate of the legislature, might withhold its sanction from an attempted evasion of the domestic law, and might apply the prohibitions of that law to a contract made beyond the limits of the state, if the parties had designedly crossed those limits for the mere purpose of making a contract which violated their own laws, it does not follow that the same principle should operate with respect to marriage, which is open to far different and higher considerations than those which may be applied

4. The statute of 1798 was not intended to have any *extra* territorial operation.

to other contracts. Indeed, marriage, though in one sense a civil contract, is much more than a contract. Founded in nature, and ordained as the provision for perpetuating the race of man, it constitutes a relation, and is the cause of other relations, which, extending through the whole fabric of every community, constitute the foundation not only of all social order and refinement, but of the continued existence of society and of nations. Originating in and consummated by consent deemed essential by natural as well as by municipal law, to the valid constitution of a marriage, it has this principal element of a contract. But being of more importance to society than all other contracts combined, and creating relations of the highest possible interest to every single nation and to all nations, while in most nations of the christian world, although this element of consent is so far regarded that an unfulfilled promise of marriage will not, at least under our law, be enforced by public authority. Every nation has undertaken to regulate for itself the essentials of a valid marriage, and the modes of its consummation, within its own territory; and every nation concedes to all the right of so doing. Each nation, also, regulates for itself, and with respect to persons and property within its own territory, the rights consequent upon a valid marriage wherever it may have taken place. And in all christian nations the marriage is not dissoluble at the mere will of the parties; but while in some countries, if originally valid, it is held to be indissoluble during the lives of the parties, it can no where be dissolved but by the intervention of public authority, on grounds presumably consistent with the objects and character of the relation, and with the good order and well being of society.

The confusion and uncertainty with regard to the legitimacy of offspring, and the rights of property and succession, are not the only evils which would follow if the validity of a marriage were subject to be tried by the various laws to which the parties

might at different times be personally subject. The fact that they have lived together as man and wife under a marriage actually and legally constituting that relation, is in itself a most weighty consideration for giving effect, in the case of marriage, to the *lex loci contractus*, although its protection may have been sought for the single purpose of evading the law of the domicil to which the parties had been subject, and to which they intended again to subject themselves by a return to their domicil. Hence it has been decided repeatedly, both in England and America, that marriages celebrated in a neighboring country, which would have been illegal if celebrated at home, are there deemed valid if they were legal at the place of celebration. (*Bishop on Marriage and Divorce*, sections 125–126; 16 *Mass. R.* 157; 8 *Pickering*, 423; 1 *Pick.* 506; *Bullers N. P.* 114; *Story's Conflict of Laws*, sections 123, 123 a, 123 b; 2 *Kent's Com.*, section 16.)

Legislators have shown an unwillingness to require, or even to authorize the disruption of a tie formed under such circumstances, by declaring it to be void because being made in fraud or evasion of the law of the domicil, it may or should be regarded as if made under that law. Much more tender should a court be in bringing to the test of the domestic law, and for the purpose of vindicating its authority, a marriage lawful where it was consummated, and the condemnation of which, while not expressly required by the domestic law, must, if it produce no more distressing consequences, degrade the parties themselves by depriving their connection of the legal sanction with which they intended and supposed it to be invested, and must shame the community itself, and shock its moral sense, by convicting it of having witnessed and countenanced a meretricious union, and cherished in honor the guilty parties. It would confound the sense of right and wrong on a subject on which it is most important that it should be kept pure and distinct, if a mar-

riage lawful in Tennessee as long as the parties chose to remain there, should become unlawful by their crossing the line into Kentucky; or if such a marriage, after being countenanced in this state for years, could be avoided as illegal and void from the beginning. And the result would be still more repugnant to the feelings and sense of justice of society, if a marriage, not forbidden by the law of nature, clothed with the forms and solemnities required by law, followed by the birth of children, maintained in purity for years, and countenanced by the respect of society, could, after the death of one of the parties, be declared to have been from the beginning unlawful and void. Certainly no support of a decision producing such a result can be found in the principles of the common law, and no court acting under its principles has yet made itself the instrument, without the express mandate of statutory law, of thus desecrating the memory of the dead and degrading the character of the living party. And we think it may be asserted that no such court ever has gone, or ever will go, beyond the enactments of the legislature, either in annulling or in declaring or treating it as null, any marriage valid where it was celebrated, unless it be on the ground of polygamy, condemned not only by the municipal law, but by the concurrent sentiment of all christendom, or on the ground of incest, condemned by the law of nature, as indicated by the common sentiment of civilized and christian men. We should not feel authorized, therefore, to pronounce this marriage void, and incompetent to confer the rights which under our laws are consequent upon a valid marriage, merely because, though celebrated in Tennessee, it may there have been celebrated in fraud, or evasion of our law, even though it were certain that we could now so declare and treat it if it had been a domestic marriage. The case is not one in which the court is to decide whether it will enforce or prevent the execution of a contract, but to say that a

marriage lawful where it was actually celebrated, continued or sustained in this state for years without objection, until by the death of one of the parties it is actually terminated, shall now be treated as a nullity, because it was an evasion of our prohibitory law. We should not consider ourselves at liberty so to treat it.

We feel bound, however, to say further, that after fully considering the statute of 1798, under all the lights that we have been able to bring to bear upon it, our deliberate conclusion is that if this marriage had taken place in Kentucky, the 9th section of the statute would neither have made it *ipso facto* void, without a sentence of nullity by a competent tribunal, nor have authorized such a sentence by any court after the death of one of the parties; and that, consequently, if a court of equity could ever have acted directly upon the question, it cannot after the death of one of the parties, and in this collateral proceeding, either pronounce a sentence of nullity or treat the marriage as null, and deny to it all the consequences of a valid marriage. \ If this be so, the question whether the marriage should be taken according to the fact, as a marriage in Tennessee, or as contended for on the part of the plaintiff, must, on account of the alledged fraudulent evasion, be regarded as if made in Kentucky, becomes immaterial, since the marriage not having been avoided during the life of both parties, its validity is now beyond question, and being regarded as valid by our law, it must have the consequences of a valid marriage with respect to the property situated here, and there is no question or conflict between the *lex loci contractus* and the *lex rei sitae*, or between the *lex domicilia* and either or both of the others.

By the law of England as it existed when the present United States were colonized from that country, illegal marriages were either void or voidable. Marriages of the former description required no judicial proceeding for ascertaining and determining

STEVENSON
vs.
GRAY, &c.

5. A marriage between a nephew and his uncle's wife, though against the statute of 1798, cannot be declared void, or so treated, after the death of one of the parties, in a collateral proceeding.

or pronouncing their invalidity, but, being absolutely void, they had none of the legal consequences of a valid marriage, and might be and were disregarded or treated as void by any court, and in any proceeding, upon mere proof of the facts which made them void. Those which were only voidable, could be avoided, or pronounced to be null, by the sentence of the ecclesiastical or spiritual courts alone, and for causes of which those courts alone had jurisdiction. It followed necessarily that the mere existence of the causes which would have authorized or required a sentence of nullity if presented to the spiritual court, could have no effect whatever in the other tribunals, legal or equitable; and that in any of these tribunals the marriage, if not *ipso facto* void, must have been regarded as valid until declared null by the proper court. The grounds upon which a marriage was to be considered as absolutely void, or as voidable only, were distinguished as being either civil or canonical disabilities, of which the former operated *ipso facto*, and had their effect in all courts, but the latter had no legal effect except by the sentence of the ecclesiastical court, which was conclusive upon the subject of the marriage and all consequential rights coming afterwards in question in any court. These distinctions forming an essential part of the English law, and fully explained in Blackstone's Commentaries, and other elementary treatises upon that law, need not be further particularized, except by the remark, that consanguinity *or* affinity —that is, relationship by blood or marriage—were among the canonical disabilities which rendered a marriage voidable by the sentence of the ecclesiastical courts, but had of themselves no effect in the civil tribunals, nor upon the general rights of the parties, or others, independently of such sentence. It is also worthy of special remark and notice, that the limitation to the life of both parties of the proceeding and sentence by which a marriage might be nullified, or pronounced to be null from the begin-

ning, on the ground of this disability, did not origin-
ate with the ecclesiastical tribunals themselves, but
was imposed upon them by the common law courts,
which, in the spirit of caution and tenderness be-
longing to that law, restrained the ecclesiastical
courts by the writ of prohibition from proceeding to
pronounce a sentence of nullity after the death of
one of the parties.   An instance of this interference
is to be found in 2d *Salkeld's Reports*, 548, where, af-
ter the death of one of the parties, the ecclesiastical
court was prohibited from proceeding to sentence of
nullity, but was allowed to punish the survivor.

It is to be assumed, then, as a common law prin-
ciple, that a marriage could not, after the death of
one of the parties, be avoided or nullified on account
of consanguinity or affinity, and it is not to be doubt-
ed that this principle, as well as the distinction be-
tween those causes which by the law of England
rendered the marriage void, and those which render-
ed it voidable only, as well as the mode in which
the existence and effect of the disability were to be
ascertained and adjudged, were well known to law-
yers and legislators in Virginia and the other colo-
nies: and the principles which have been referred
to were probably not unfamiliar to the mass of intel-
ligent citizens, who, although they may never have
witnessed a sentence of nullity by an ecclesiastical
court, may be presumed to have understood that all
marriages within the Levitical degrees were not ne-
cessarily void, and that some judicial proceeding
was necessary to declare them so.

We have not been referred to the Virginia legis-
lation on the subject, and in a cursory examina-
tion have found no act relating to incestuous mar-
riages of a date prior to that of 1788, before alluded
to.   In the absence of any ecclesiastical jurisdiction
over the subject, legislation was necessary to give
the jurisdiction to the civil tribunals.   And at any
rate, after the change of government, legislation
may have been essential for defining the prohibited

degrees, as well as for giving to the civil courts jurisdiction to investigate the facts and pronounce the appropriate sentence with respect to marriages coming within the prohibition. The Virginia statute, like that of Kentucky, commences with the words: "If any person (whatsoever) shall hereafter marry within the following degrees, that is to say, &c., (enumerating them,) every person or persons so unlawfully married, shall be separated by the definitive sentence or judgment of the high court of chancery ; and the attorney general is required, upon being informed of such marriage, to exhibit a bill in said court against the parties, who are required to answer; and upon the bill and answer, and depositions where they are necessary, the court shall and may proceed to give judgment, and to declare the nullity of the marriage; and, moreover, may punish the parties by fine, which is to be assessed by a jury, and is appropriated to the poor of the county wherein the offense is committed ; and the court may require the parties to give bond against future cohabition : provided that nothing in the act shall render illegitimate the issue of any marriage so annulled." (See *Henning's Statutes at large, vol.* 12, *p.* 689.)

It will be seen that this statute, like our own of 1798, contains no express prohibition of the marriages which it describes, but in calling them unlawful, seems to refer to some pre-existing law. And although, from the repealing clause of the statute, there would seem to have been previous statutes, probably before the revolution, relating to incestuous marriages, we cannot assume that these statutes, any more than that of 1788, introduced any new law of prohibition, but may rather assume that all were founded upon and referred to the Levitical law as practically adopted in England, and that if they did not restrict the prohibitions of that law, they did nothing more than give to it the same effect as in England, by creating a jurisdiction and providing a mode of proceeding in the civil courts, by which it

might be enforced with substantially the same results as in the ecclesiastical courts.

But waiving any inference founded upon the supposed contents of statutes of which we have no account, we think the acts of 1788 and 1798, bear strong internal evidence that they, or at least that the first, of which the last is substantially a copy, are founded upon the existing law of England relating to marriages within the prohibited degrees. They have for their principal object, after defining the marriages deemed unlawful, to provide, in analogy to the ecclesiastical jurisdiction, for such marriages being authoritatively annulled; saving, however, the legitimacy of the issue proceeding from them; and the language used, and every part of the appointed proceeding indicate, the analogy referred to. The separation of the parties by definitive sentence —the declaration of the nullity of the marriage, and the bond against future cohabitation, are usual acts of the ecclesiastical courts, expressed in the phraseology of the same courts, which had also the right to inflict punishment upon the offenders, by penance, at least, and we suppose by fine. And, further, the statutes evidently contemplate and provide for a proceeding against both parties to the marriage, and not against one alone. The end and prominent object of the proceeding, which is to separate the parties who have unlawfully united themselves, is the first and last thing expressed in directing the action of the court. That every person or persons so unlawfully married shall be separated by definitive sentence, does not mean that when the death of one has already separated the married couple, the survivor shall be separated by the sentence of a court; nor, in such a case, could there be any occasion for a bond against cohabition. And although a declaration of the nullity of the marriage, or that the marriage is or was void to all intents and purposes, might be made after the death of one, or even both of the parties, without absolute or flagrant inconsistency, yet as

such a sentence, in case of a marriage not absolutely void, was prohibited by the common law courts, even if one of the parties were dead, every presumption is against its being authorized or intended to be authorized by a statute which neither expressly directs nor provides for such a declaration in case one of the parties be dead, nor expressly declares or makes the marriage void upon the facts alone, without the judgment or sentence of a court.

But again: each statute expressly directs a proceeding against the persons unlawfully married; and it is only as the result of that proceeding—in Virginia by bill in chancery, and in Kentucky by indictment—that the court is authorized and required to declare the nullity of the marriage. The statute does not itself declare that such marriages shall be null and void, but only subjects them to be so declared in a special proceeding, instituted for the purpose of ascertaining the facts and adjudging the legal consequence against both parties, and which, therefore, cannot be instituted with the intended effect after the death of one. It is to be observed, too, that although a discretionary fine may be imposed if the parties be convicted, the statute of Kentucky, as if referring its execution rather to the sentiment than to the duty, either of individuals or the community, does not direct any inquiry for such marriages in the first instance, but waits for a complaint to the public attorney, who, upon such complaint, is directed to file an indictment. And in Virginia, it was only upon information given to the attorney general that he was directed to institute the statutory proceeding for nullifying the marriage.

The only trace which we have found in the Virginia Reports of any judgment of the nullity of a marriage, is in *Perryman's case*, 2 *Leigh's Reports*, 717. That is stated to have been an information against Perryman and wife, the latter having been the wife and widow of his brother. The case described in the statute, (*Revised Code, chapter* 106,) supposed to

be in substance the same as the act of 1788, except as to the tribunal and mode of proceeding, is that of a brother marrying his brother's wife. And upon a verdict finding specially the facts above stated, the court of appeals directed the circuit court "to give judgment against the defendants, declare the nullity of the marriage, and cause them to give bond, with surety, that they will not cohabit hereafter." There may have been other cases in Virginia, which have not come to our notice, and we refer to this rather as illustrating or greatly aiding, than as in its self establishing, our construction.

The fact that the present is the only case in which this court has ever been called on to give construction and application to the 9th section of the statute of 1798, if it does not prove that there have been no marriages coming within its operation, tends at least to prove that there have been none of a character which so shocked the public sense of decorum, or otherwise so excited the condemnation of society, as to cause the institution of any direct proceeding against the parties. And although the marriage now brought in question does not accord with our own sense of propriety, it may at least be said that the parties were not related in blood; and there may have been other circumstances which tended, in the eyes of the community, to mitigate or excuse an alliance, certainly unusual, and *prima facie* unsuitable. At any rate, the long acquiescence of relatives and of the community, are calculated to cast some disfavor on the untimely attempt to have the marriage now nullified or treated as void.

It is proper to say that the statutes of Virginia and Kentucky, in declaring that the annulment of the marriage shall not affect the legitimacy of the issue, has removed some of the most weighty considerations which have inclined courts to sustain marriages, under many of the impeachments to which they have been subjected. And there is no doubt that the fact that a sentence of nullity had by the English law the effect of bastardizing the issue, was

an operative reason, for the interference of the common law courts, to prohibit the ecclesiastical courts from pronouncing such a sentence after the death of one of the parties to the marriage. But we cannot say that this was the only reason; and if it were, still the principle was established, that for a disability on account of consanguity, or affinity the marriage was not void, and could not be avoided after the death of one of or both of the parties; and the statute having neither declared such marriage absolutely void, nor made it expressly voidable except during the life of both parties, the fact that it has removed one of the inconveniences which would arise from a sentence of nullity after the death of one of the parties, does not authorize a construction which would violate an established principle in the proceeding for which the statute intends to furnish a substitute, and to which its language and provisions indicate an intention to adhere, rather than to depart from it.

Nor do we consider this case as coming within the principle on which a court refuses to sanction or enforce an ordinary contract. Even in the case of ordinary contracts completely executed, the court would rarely, if at all, interpose to deprive one of the parties of its benefits, which he was actually enjoying. And in proportion to the length of time and of acquiescence, so the grounds for such an interposition must be the more weighty and extraordinary in order to justify it. But, as already shown, this is not a case of ordinary contract; and though it be regarded as prohibited under a penalty, it was not absolutely void, because it was not so declared by the statute; and it is not now even voidable, because the statute does not provide for nor intend its being avoided after the death of one of the parties. And being now to be regarded and treated as a valid marriage, whether considered as celebrated in Kentucky or Tennessee, it is also to be regarded as having all the consequences of a valid marriage accord-

ing to the laws of Kentucky, and as, therefore, enti-
tling the surviving husband to all the rights of a
lawful husband in the real and personal estate of
his deceased wife.

    Wherefore, the judgment is affirmed.