PENNEGAR AND HANEY *v.* STATE.

(*Nashville.*   January  29,  1889.)

1. MARRIAGE AND DIVORCE.   *Marriage celebrated in another State invalid in this State, when.*

Marriage, celebrated in another State, between citizens and residents of this State, temporarily there, is invalid here, where the contracting parties—being a wife, divorced for adultery, and her adulterer —procured the solemnization of their marriage abroad for the purpose of evading our statute inhibiting such marriage during the lifetime of the former husband.   The marriage is void, as being contrary to a settled public policy of this State.

Code cited : § 3332 (M. & V.) ; § 2475, (T. & S.).

Cases cited and approved : Owen *v.* Brackett, 7 Lea, 448 ; Carter *v.* Montgomery, 2 Tenn. Ch., 225 ; State *v.* Bell, 7 Bax., 9 ; 30 Grat., 858 ; 76 N. C., 251, 242 ; 39 Ga., 321 ; 10 La., 411 ; 5 Ired. L., 535.

Pennegar and Haney v. The State.

Cited and distinguished: Dickson v. Dickson, 1 Yer., 110; 71 Penn. St., 240.

Cited and disapproved: 16 Mass., 157; 9 H. of L. Cases, 193; 113 Mass., 458; 8 Pick., 433; 17 B. Mon., 193.

2. SAME.  Same.  Lewdness.

The parties to such invalid marriage are guilty of lewdness, if they live together as man and wife in this State.

FROM DEKALB.

Appeal in error from Circuit Court of DeKalb County.  M. D. SMALLMAN, J.

WEBB & AVANT for Pennegar and Haney.

Attorney-General PICKLE for State.

FOLKES, J.  The defendants were indicted for lewdness, tried and convicted, and have appealed in error to this Court.

The record discloses the following facts: E. N. Haney was divorced from her husband, John Haney, by a decree of the Circuit Court of DeKalb County, upon the petition of the husband, charging her with adultery with Wm. Pennegar. The decree adjudged the charge fully proven, and the divorce was granted the husband solely upon such charge.

The divorced wife and the partner in her guilt, shortly after the divorce, went to Jackson County,

State of Alabama, where they were married to each other, and on the next day after their marriage returned to DeKalb County, in this State, the place of their former and present residence, where they have been living and cohabiting openly and publicly as man and wife, all within twelve months before the indictment found in this case, the divorced husband, John Haney, still living.

Section 3332 of M. & V. Code enacts:

"When a marriage is absolutely annulled the parties shall severally be at liberty to marry again; but a defendant who has been guilty of adultery shall not marry the person with whom the crime was committed during the life of the former husband or wife."

The marriage, being prohibited by statute, is void if solemnized in this State. Bishop on Mar. and Div., Secs. 46, 223; *Carter* v. *Montgomery*, 2 Tenn. Ch., 225; *Owen* v. *Brackett*, 7 Lea, 448.

In the last case cited this Court held the woman not entitled to homestead where the marriage was had in this State in violation of the statute quoted above.

It is admitted that there is nothing in the laws of Alabama prohibiting the guilty, divorced party from marrying the paramour.

The question, therefore, presented in this record is whether citizens of this State, prohibited by the statute referred to from marrying, can, by crossing over into a sister State, where such marriages are not inhibited, claim the benefit of the marriage

there contracted when they return at once to this State, having left it for the manifest purpose of evading our statute.

The question is of first impression in this State, and one not free from difficulty by reason of certain well established principles, universally recognized in the law of marriage, which apparently would sustain such marriage, chief of which is that which says "a marriage valid where solemnized is valid everywhere." Adjudged cases are to be found which, under the supposed application of this rule, have sustained marriages identical with the one at bar in all of its essential facts, while others of equal respectability have reached a different result, to some or both of which we will refer later on.

Before doing so let us see what are the general principles controlling in cases of this character. Marriage is an institution recognized and goverened, to a large degree, by international law prevailing in all countries, and constituting an essential element in all earthly society.

The well being of society, as it concerns the relation of the sexes, the legitimacy of offspring, and the disposition of property, alike demand that one State or nation shall recognize the validity of marriage had in other States or nations, according to the laws of the latter, unless some positive statute or pronounced public policy of the particular State demands otherwise.

It may be said, therefore, to be a rule of universal recognition in all civilized countries that in

general a marriage valid where celebrated is valid everywhere. We say "in general," because there are exceptions to the rule as well established as the rule itself.

These exceptions or modifications of the general rule may be classified as follows:

*First*—Marriages which are deemed contrary to the law of nature as generally recognized in Christian countries.

*Second*—Marriages which the local law-making power has declared shall not be allowed any validity, either in express terms or by necessary implication.

To the first class belong those which involve polygamy and incest; and in the sense in which the term incest is used is embraced only such marriages as are incestuous according to the generally accepted opinion of Christendom, which relates only to persons in direct line of consanguinity and brothers and sisters.

The second class—*i. e.*, those prohibited in terms by the statute—presents difficulties that are not always easy of solution, and have led to conflicting decisions. This class may be subdivided into two classes: First, where the statutory prohibition relates to *form, ceremony,* and *qualification* it is held that compliance with the law of the place of marriage is sufficient, and its validity will be recognized not only in other States generally, but in the State of the domicile of the parties, even where they have left their own State to marry

elsewhere for the purpose of avoiding the laws of their domicile. Instead of being called a subdivision of the second class of exceptions, it would be more accurate to say that it is an exception to the exception, and falls within the operation of the general rule first announced of "valid where performed valid everywhere."

To the second subdivision of the second class of exceptions belong cases which, prohibited by statute, may or may not embody distinctive State policy as effecting the morals or good order of society.

It is not always easy to determine what is a positive State policy. It will not do to say that every provision of a statute prohibiting marriage under certain circumstances, or between certain parties, is indicative of a State policy in the sense in which it is used in this connection. To so hold would be to overturn this most solemn relation, involving legitimacy of offspring, homestead, dower, and the rights of property, in the face of the conclusions of approved text-writers and the concurrence of the adjudications in numerous cases relating not only to forms or ceremonies and qualifications of the parties, but also to prohibited degrees of relationship not incestuous in the common opinion of Christian countries, and relating to marriages between persons of different race and color.

Each State or nation has ultimately to determine for itself what statutory inhibitions are by it intended to be imperative as indicative of the

decided policy of the State concerning the morals and good order of society to that degree which will render it proper to disregard the *jus gentium* of "valid where solemnized valid everywhere."

The Legislature has, beyond all possible question, the power to enact what marriages shall be void in its own State, notwithstanding their validity in the State where celebrated, whether contracted between parties who were in good faith domiciled in the State where the ceremony was performed or between parties who left the State of domicile for the purpose of avoiding its statute, when they come or return to the State; and some of the States have in terms legislated on the subject.

Where, however, the Legislature, as in our own State, has not deemed it proper or necessary to provide in terms what shall be the fate of a marriage valid where performed, but has, in the particular case, contented itself with merely prohibiting such marriages, the duty is devolved upon the Courts of determining, from such legislation as is before it, whether the marriage in the other State is valid or void when the parties come into this State.

If, as we have seen, the statutory inhibition relates to matters of form or ceremony, and in some respects to qualification of the parties, the Courts would hold such marriage valid here; but if the statutory prohibition is expressive of a decided State policy as a matter of morals, the Courts

must adjudge the marriage void here, as *contra bonos mores.*

Thus, in *State* v. *Bell*, 7 Bax., 9, this Court held that a marriage between a white person and a negro, valid in Mississippi where celebrated, was void here, in a case where the parties were domiciled in Mississippi at the time of the marriage.

This case is distinguishable from the case at bar, not only by reason of the domicile in Mississippi, but also in that we have a highly penal statute on the subject of marriages between whites and blacks, passed in 1870 in amendment of the Act which prohibited such marriages theretofore, and by the very pronounced convictions of the people of this State as to the demoralization and debauchery involved in such alliances.

The decision in the above case is so manifestly in keeping with sound principles, now well established, that it need not be here fortified by citation of authority. But we pause to call attention to a case relied on by counsel for defendants, holding not only that such a marriage solemnized in Rhode Island (where it was legal) between persons domiciled there would be valid in Massachusetts, but that it was valid in the latter State where the parties had left Massachusetts and gone into Rhode Island for the express purpose of evading the Massachusetts law prohibiting such marriage, and returned to Massachusetts. *Medway* v. *Needham*, 16 Mass., 157.

This was certainly carrying the doctrine of

"valid where performed valid everywhere" to an extreme limit. The case has been much criticised, more so, indeed, than it deserves, as it seems to us; for, while to our mind the *result* is startling, it is not out of harmony in its *argument* with the principles we have stated. The learned Judge delivering the opinion, in speaking of the exception to the general rule, says:

"Motives of policy may likewise be admitted into consideration of the extent to which this exception is to be allowed to operate. If without any restriction, then it might be that incestuous marriages might be contracted between citizens of a State where they were held unlawful and void, in countries where they were not prohibited, and the parties return to live in defiance of the religion and laws of their own country. But it is not to be inferred, from a toleration of marriages which are prohibited merely on account of political expediency, that others, which would tend to outrage the principles and feelings of all civilized nations, would be countenanced."

So that the difference between this case and the 7 Bax., 9, case is a difference in "motives of policy" and ideas of "political expediency." We do not think, therefore, that the case is open to the criticism passed upon it by the Lord Chancellor in *Brook* v. *Brook*, 9 House of Lords Cases, 193, which case is itself, with equal propriety, criticised by Gray, C. J., in *Commonwealth* v. *Lane*, 113 Mass., 458, which contains a very able and

elaborate review of the subject under consideration. Though unable to concur in some of the arguments, and especially with the dictum that "a marriage which is prohibited here by statute, because contrary to the policy of our laws, is yet valid if celebrated elsewhere according to the law of the place, *even if the parties are citizens and residents of this Commonwealth, and have gone abroad for the purpose of evading our laws, unless the Legislature has clearly enacted that such marriages out of the State shall have no validity here.*"

Of course we refer to so much of the above as we have italicized, for it is the purest *dictum*, it being a case where there was no proof of an intent to evade the laws of Massachusetts, as is shown by the Judge himself, who concludes his opinion as follows:

"Upon the principles and authorities stated in the earlier part of this opinion, it certainly cannot invalidate a subsequent marriage in another State according to its laws, at least without proof that the parties went into that State, and were married there with the intent to evade the provisions of the statutes of this Commonwealth. No such intent being shown in this case, we need not consider its effect, if proved, nor whether the indictment was in due form."

This case being an indictment for polygamy, where a wife, having obtained a divorce on the account of the husband's adultery (in which case he was prohibited from marrying again without

leave of the Court), the husband married another woman in another State, without proof that the second wife ever resided in Massachusetts prior to her marriage, and without proof of a purposed evasion of the Massachusetts law.

Recurring for a moment to the 16 Mass. case, it may well be that, recognizing and applying the same general principles, the Courts in different States may reach different results in the same class of cases, according as the general and fixed sentiment of the public in the respective States may differ in matters of public policy, and if not of " political expediency."

What might be deemed a mere regulation in one State might be regarded as a matter vitally affecting the morals and good order of society in another; so that what is pointed out as a reproach to the law, by reason of the conflict in the reported cases from different States and nations, is in fact evidence of the universality of the general principles recognized as fundamental by all enlightened Courts, the different results reached being due to the statutory enactments of the different States, as construed by Courts thereof, who interpret the meaning, intent, and scope of each particular statute on the subject of marriage in the light of the known policy of the State, deviating from the general principles of the international law of marriage only so far as they are constrained to do so by the terms of legislative enactments, or

by the manifest and distinctive policy of the State as understood by the Courts.

Now, believing, as we do, that the statute in question, which we are called upon to construe in the case at bar, is expressive of a decided State policy not to permit the sensibilities of the innocent and injured husband or wife, who has been driven by the adultery of his or her consort to the necessity of obtaining a divorce, to be wounded, nor the public decency to be affronted by being forced to witness the continued cohabitation of the adulterous pair, even under the guise of a subsequent marriage, performed in another State for the purpose of evading our statute, and believing that the moral sense of the community is shocked and outraged by such an exhibition, we will not allow such parties to shield themselves behind a general rule of the law of marriage, the wisdom and perpetuity of which depends as much upon the judicious exceptions thereto as upon the inherent right of the rule itself.

After what has been already said in the earlier part of this opinion it is doubtless unnecessary to say that, in reaching the conclusion just announced, we do not intend, in the slightest degree, to encroach upon the principle which recognizes as valid marriages had in other States, where the parties have gone to such other States for the purpose of avoiding our own laws in matters of form, ceremony, or qualification merely; but, confining ourselves to the facts of this case, we hold that

where citizens of this State withdraw temporarily to another State, and there marry, for the purpose and with the intent of avoiding the statute in question, passed in pursuance of a determined policy of the State, in the interest of public morals, peace, and good order of society, such parties, upon their return to this State and cohabiting as man and wife, are liable to indictment in the Courts of this State for lewdness.

The case of *Dickson* v. *Dickson*, 1 Yer., 110, has no concern with the point adjudged in the case at bar. That case merely decides that a person divorced in Kentucky for adultery, and not by the laws of that State permitted to marry again, might contract a valid marriage in this State prior to the Act of 1835, which for the first time prohibited such marriages; and having come to this State in good faith, married, and continued to reside here up to the time of her husband's death, she was held entitled to dower. The only instruction to be drawn from this case is that, notwithstanding our statute, these parties might have contracted a marriage in Alabama, where there is no similar statute, had they removed there in good faith, which would be valid in that State.

*Putnam* v. *Putnam*, 8 Pick., 433, is a case deciding directly contrary to the conclusion we have reached, and the facts in that case were identical with this. It is extremely brief, is unsatisfactory to us from every point of view, and is predicated entirely upon the case of *Medway* v. *Needham*, 16

Mass., 157, decided ten years before, which the Court said was "binding upon it and the community until the Legislature shall see fit to alter it." While speaking of *Medway* v. *Needham* the opinion continues:

"The Court were aware of all the objections to the doctrine in that case, and knew it to be *vexata quæstio* among civilians; but they adopted the rule of the law of England on this subject on the same ground it was adopted there, namely: the extreme danger and difficulty of vacating a marriage which, by the laws of the country where it was entered into, was valid."

It is manifest that the effort to fortify *Medway* v. *Needham* by assuming that it is based on the law of England must fail, if the House of Lords are competent to testify as to the state of the law in England on the subject, for we find that in *Brook* v. *Brook*, 9 H. of L. Cases, 219, the Lord Chancellor, in speaking of the case of *Medway* v. *Needham*, as we have already seen, says "it is entitled to but little weight, and is based upon decisions which relate to form and ceremony of marriage," and adds:

"If a marriage is absolutely prohibited in any country as being contrary to public policy and leading to social evils, I think that the domiciled inhabitants in that country cannot be permitted, by passing the frontier and entering another State in which the marriage is not prohibited, to celebrate a marriage forbidden by their own State,

and, immediately returning to their own State, to insist on their marriage being recognized as lawful."

This is, in our opinion, the true doctrine, and we have quoted so much to show that the highest English Court does not hold to the principle upon which it is claimed by the Massachusetts Court the Medway case is based. But, with due deference, we must be permitted to say that the decision in the case of *Brook* v. *Brook* goes farther than we think the principle announced requires—farther, at least, than we would be inclined to go—when, as was done in that case, it was held that, while both were resident in England, the man married his deceased wife's sister in Denmark, where such marriage was legal, and returning to England the marriage was void there, because a marriage between parties so related was contrary to the laws of England. Such a marriage would, we think, not fall within any of the exceptions to the general rule. It certainly cannot be said to be incestuous in the estimation of Christendom, and it would seem that, under the policy of many of the States of this Union, such a marriage is not immoral nor tending to any social evil affecting the welfare of society. But, after all, it must be admitted that it was for that Court to determine whether or not the law infringed was indicative of a decided and essential public policy in England; and the Courts of that country would doubtless be as slow to approve

our estimate of the public policy which con-
demns the marriage of the divorced adulterer, since
the clause prohibiting such marriages was, upon
the argument of Lord Palmerston that the guilty
party was preserved from ruin by such a mar-
riage, stricken from the divorce bill in the House
of Commons, as we are to accept their opinion
that a marriage between a man and his deceased
wife's sister is contrary to good morals.

. We return for a moment to *Putnam* v. *Putnam*
to note that the Court in this case closes its opin-
ion with this language, that "if it shall be found
*inconvenient or repugnant to sound principle* [the ital-
ics ours], it may be expected that the Legislature
will explicitly enact that marriages contracted
within another State, which, if entered into here,
would be void, shall have no force within this Com-
monwealth." The Legislature did shortly thereafter
so enact, whether because the doctrine laid down in
the case was inconvenient or because repugnant to
sound principle does not appear. In our view of
the law both considerations might well have moved
the Legislature.

*Stevenson* v. *Gray*, 17 B. Mon., 193, is a case
holding the doctrine of *Putnam* v. *Putnam*, and
after what we have said about the latter case need
not be further noticed here.

*Van Storch* v. *Griffin*, 71 Penn. St., 240, does
not sustain the contention of counsel in the point
decided, as there is nothing in the case to show
that the parties went from one State to the other

for the .purpose of evading the laws of the one. It merely holds that the decree of divorce in New York, which forbade the respondent from marrying again during the life of the libellant, had no extra territorial effect;. so that what is said in the opinion about going from one State to the other for the purpose of evading the law of the State granting the divorce is *dictum* pure and simple.

In full accord with the conclusion we have reached in the case at bar is *Kinney* v. *Commonwealth*, 30 Grat., 858, where it was held that a marriage between a negro and a white person had in the District of Columbia, for the purpose of evading the law of Virginia, was void upon the return.

To the same effect see *State* v. *Kennedy*, 76 N. C., 251; *Scott* v. *Scott*, 39 Ga., 321; *Dupre* v. *Bulard*, 10 La., 411.

The intention to evade the law by going into another State was made the test of its validity in North Carolina, as will be seen by reference to the two cases of *State* v. *Kennedy*, 76 N: C., 251, above cited, and *State* v. *Ross*, *Ib.*, 242—both marriages between a white person and negro. In Kennedy's case, such intention being shown, the marriage was held void; while in Ross' case, it being shown that there was *no intent* to return to North Carolina, though the parties afterward did so, the defendant was held not guilty of fornication. This was, however, by a divided Court, and

Pennegar and Haney *v.* The State.

is contrary to our own case of *State* v. *Bell*, 7 Bax., 9.

We conclude this opinion, already too long, by a reference to *Williams* v. *Oates*, 5 Ired. L., 535, where Chief Justice Ruffin, in delivering the opinion of the Court in a case very similar to our own, says:

"Now, if the law of South Carolina allow of such a marriage, and although it be true that generally marriages are to be judged by the *lex loci contractus*, yet every country must so far respect its own laws, and their operation on its own citizens, as not to allow them to be evaded by acts in another country purposely to defraud them."

See also Wharton's Conf. of Laws, Secs. 135, 181, 182.

Let the judgment of the Circuit Court be affirmed.