MARIA CATALANO ET AL. *v.* RAPHAEL J. CATALANO,
ADMINISTRATOR (ESTATE OF FRED CATALANO)

BALDWIN, C. J., KING, MURPHY, MELLITZ and SHEA, Js.

Argued February 9—decided April 20, 1961

*Leo V. Gaffney,* with whom were *Bernard D. Gaffney* and *Frank J. DiLoreto,* for the plaintiffs.

*Ralph C. Dixon,* with whom were *Ferdinand D'Esopo* and *Raymond B. Green,* for the defendant.

MURPHY, J. The plaintiff appealed to the Superior Court from the action of the Probate Court for the district of Hartford in denying her application for a widow's allowance for support from the estate of Fred Catalano. The parties have stipulated as to the facts, and the Superior Court has reserved the matter for the advice of this court.[1]

The material facts are these: Fred Catalano, a widower and citizen of this state, was married on December 8, 1951, in Italy to the plaintiff, his niece, an Italian subject. Such a marriage was prohibited by § 87 of the Italian Civil Code, but since the parties obtained a legal dispensation for the marriage from the Italian authorities, it was valid in Italy. Fred returned to this country. The plaintiff remained in Italy until 1956, when she joined Fred and they came to Hartford, where they lived as husband and wife until his death in 1958. A son was born to the couple. The plaintiff claims to be the surviving spouse of the decedent and, as such, entitled to an allowance for support under the provisions of § 45-250 of the General Statutes.

The determination of the question propounded

---

[1] The question upon which advice is desired is: "Was Maria Catalano the surviving spouse of Fred Catalano under the laws of the State of Connecticut as of the date of his death on October 11, 1958, and as such was she qualified to receive support under Section 45-250 of the General Statutes, Revision of 1958?"

depends upon the interrelation and judicial interpretation of three statutes, §§ 46-1, 46-6 and 53-223.[2] Legislation prohibiting the marriage of uncle and niece was originally enacted by the General Assembly in 1702 as part of "An Act to prevent Incestuous Marriages." Statutes, 1702-1733, p. 74; see *Gould* v. *Gould,* 78 Conn. 242, 246, 61 A. 604. It provided that no man should marry any woman within the degrees of kindred specified, including that of uncle and niece, and that any such marriage was null and void. In the Revision of 1875, the language now appearing in § 46-1 was adopted. Rev. 1875, p. 185, § 1. It has been the declared public policy of this state continuously since 1702 to prohibit marriages of uncle and niece and declare them void.

Section 46-6 was enacted as chapter 197 of the Public Acts of 1913 under the title, "An act concerning the Celebration of Marriage by Citizens of Connecticut in Foreign Countries." The first section of chapter 197 is now the first sentence in § 46-6 and is printed in footnote 2. The portion of § 46-6 not printed in the footnote has no application to the facts of this case. What is now § 53-223

[2] "Sec. 46-1. KINDRED WHO SHALL NOT MARRY. No man shall marry his mother, grandmother, daughter, granddaughter, sister, aunt, niece, stepmother or stepdaughter, and no woman shall marry her father, grandfather, son, grandson, brother, uncle, nephew, stepfather or stepson; and, if any man or woman marries within the degrees aforesaid, such marriage shall be void."

"Sec. 46-6. WHEN MARRIAGES IN FOREIGN COUNTRIES ARE VALID. All marriages where one or both parties are citizens of this state, celebrated in a foreign country in conformity with the law of that country, shall be valid, provided each party would have legal capacity to contract such marriage in this state. . . ."

"Sec. 53-223. INCEST. Every man and woman who marry or carnally know each other, being within any of the degrees of kindred specified in section 46-1, shall be imprisoned in the State Prison not more than ten years."

was originally adopted, in a different form, as an integral part of the act of 1702. The punishment of those within the prohibited degrees of kindred who married or carnally knew each other was therein specified. Statutes, 1702-1733, p. 74.

It is the generally accepted rule that a marriage valid where the ceremony is performed is valid everywhere. *Davis* v. *Davis,* 119 Conn. 194, 197, 175 A. 574. There are, however, certain exceptions to that rule, including one which regards as invalid incestuous marriages between persons so closely related that their marriage is contrary to the strong public policy of the domicil though valid where celebrated. Restatement, Conflict of Laws § 132 (b). That exception may be expressed in the terms of a statute or by necessary implication. *Pennegar* v. *State,* 87 Tenn. 244, 247, 10 S.W. 305. Section 46-6 only validates foreign marriages which could have been legally entered into in this state at the time they were contracted. As § 46-1 created an impediment to the union of uncle and niece in this state, the plaintiff and her uncle lacked the legal capacity which § 46-6 makes a prerequisite to the validity, in this state, of such a marriage as theirs. A state has the authority to declare what marriages of its citizens shall be recognized as valid, regardless of the fact that the marriages may have been entered into in foreign jurisdictions where they were valid. *Murphy* v. *Murphy,* 249 Mass. 552, 555, 144 N.E. 394.

To determine whether the marriage in the instant case is contrary to the public policy of this state, it is only necessary to consider that marriages between uncle and niece have been interdicted and declared void continuously since 1702 and that ever since then it has been a crime for such kindred to

either marry or carnally know each other. At the time of the plaintiff's marriage in 1951, the penalty for incest was, and it has continued to be, imprisonment in the state prison for not more than ten years. Rev. 1949, § 8551; General Statutes § 52-223. This relatively high penalty clearly reflects the strong public policy of this state. We cannot completely disregard the import and intent of our statutory law and engage in judicial legislation. The marriage of the plaintiff and Fred Catalano, though valid in Italy under its laws, was not valid in Connecticut because it contravened the public policy of this state. *Johnson* v. *Johnson,* 57 Wash. 89, 90, 106 P. 500; *Osoinach* v. *Watkins,* 235 Ala. 564, 569, 180 So. 577; *State* v. *Brown,* 47 Ohio St. 102, 108, 23 N.E. 747; note, 117 A.L.R. 186, 199. The plaintiff therefore cannot qualify under § 45-250 as the surviving spouse of Fred Catalano.

We answer the question propounded "No."

In this opinion BALDWIN, C. J., KING and SHEA, Js., concurred.

MELLITZ, J. (dissenting). We are dealing here with the marriage status of a woman who was validly married at the place of her domicil and who, so far as the record discloses, was entirely innocent of any intent to evade the laws of Connecticut. Mrs. Catalano was a resident and domiciliary of Italy when her uncle came from America and married her in Italy. Although he returned to America soon after the marriage, she continued to reside in Italy for almost five years before she came to America and took up her residence in Connecticut, where she gave birth to a son. There is no suggestion anywhere in the record that at the time of the marriage she intended to come to America, that the parties

had any intention of coming to live in Connecticut, or that the marriage was entered into in Italy for the purpose of evading the laws of Connecticut. If a marriage status resulting from a valid marriage, such as the one here, is to be destroyed, the issue bastardized, and the relations of the parties branded as illicit, it should follow only from an explicit enactment of the legislature, giving clear expression to a public policy which compels such harsh consequences to ensue from a marriage entered into under the circumstances disclosed here.

The cases cited in the majority opinion which deal with the question we have here are all cases where the parties went to a foreign state to evade the law of the domicil and the marriage celebrated in the foreign state was refused recognition in the place of their domicil when they returned to live there after the marriage. The significance of this element is emphasized in the holdings in the Washington cases. The majority opinion cites *Johnson* v. *Johnson,* 57 Wash. 89, 90, 106 P. 500, to support its view, but in *Pierce* v. *Pierce,* 58 Wash. 622, 624, 109 P. 45, the *Johnson* case is specifically distinguished on the ground that the Johnson marriage was a clear case of evasion of Washington laws. In the *Pierce* case, the woman was found to be innocent of an intent to evade a Washington statute which prohibited divorced persons from contracting marriage within a certain time. The marriage, celebrated in a foreign state, was accorded recognition, and this in the face of a provision in the statute that marriages contracted in violation of it, "whether contracted within or without [the] state, shall be void." Wash. Sess. Laws 1893, c. 94, § 1. The positive inhibition of the statute was held to apply only to domiciliaries of the state, the court declaring (p. 625): "If

the marriage is entered into by one who has in good faith removed to another jurisdiction, not for the mere purpose of the marriage or to evade the rigor of the local law, but to establish a domicile, the marriage should be held valid." In *Pennegar* v. *State,* 87 Tenn. 244, 258, 10 S.W. 305, the opinion declares that the true doctrine recognized in Tennessee is against according validity to marriages of domiciled inhabitants who have gone into another state to celebrate a marriage forbidden by their own state. Not only did *Murphy* v. *Murphy,* 249 Mass. 552, 554, 144 N.E. 394, involve the celebration in Rhode Island of a marriage prohibited in Massachusetts but the Uniform Marriage Evasion Act, in effect in Massachusetts and quoted in the opinion, expressly declared such a marriage void in Massachusetts. Mass. Acts 1913, c. 360, § 1, as amended, Mass. Gen. Laws, c. 207, § 10 (1921). *Osoinach* v. *Watkins,* 235 Ala. 564, 180 So. 577, involved a marriage, celebrated in Georgia, of parties who were domiciled in Alabama and returned there to live immediately after the marriage.

The provisions of § 46-1, prohibiting marriages within specified degrees of consanguinity, apply only to marriages celebrated in Connecticut and are not given extraterritorial operation by the provisions of § 46-6. The first sentence of § 46-6, quoted in the majority opinion, was originally enacted as § 1 of chapter 197 of the Public Acts of 1913. It does not purport to invalidate or declare void in Connecticut foreign marriages celebrated in contravention of the laws of Connecticut. It is a validating statute and declares valid the marriage of a citizen of Connecticut celebrated in a foreign country in conformity with the law of that country, provided each party would have legal capacity to

contract the marriage in Connecticut. Capacity, in the sense employed in the statute, is defined in 2 Beale, Conflict of Laws § 121.6, as follows: "By capacity to enter into a marriage is meant a quality which legally prevents the person in question marrying anyone; it does not refer to some quality which prevents the particular marriage in question, though the person may marry someone else. A typical example of capacity is nonage, or having a living spouse. A typical example of a quality which prevents the particular marriage, though the person has capacity to marry, is consanguinity." That it is capacity in this sense which is meant in the first sentence of § 46-6 finds confirmation in the fact that, under other portions of the statute, a valid foreign marriage of a Connecticut citizen requires, in addition to certain specified formalities, only that the parties have the qualities which entitle them to obtain a marriage license in Connecticut.[3] The presentation of the license certificate to the officiating clergyman operates to give him authority to celebrate the marriage in the foreign country. Nothing in these provisions of the statute requires

---

[3] "Sec. 46-6. . . . All marriages when one or both parties are citizens of this state, celebrated in a foreign country, in the presence of the ambassador or minister to that country from the United States or in the presence of a consular officer of the United States accredited to such country, at a place within his consular jurisdiction, by any ordained or licensed clergyman engaged in the work of the ministry in any state of the United States or in any foreign country, shall be valid, provided a license certificate, such as is required by the laws of this state, shall have been obtained from the registrar of vital statistics of the town in this state to which one or both of the parties to such marriage belong; and such registrar is authorized to act in such matter. Such license certificate presented to such clergyman shall operate as a license for the celebration by him of such marriage in such foreign country, and the provisions of the laws of this state shall apply to such a license certificate, except that the return thereof shall be made to such registrar. . . ."

that the persons to be married under them have capacity to contract the particular marriage in this state. There is no requirement under § 46-5, which deals with marriage licenses, that, as a prerequisite to the obtaining of a license, the relationship to each other of the parties to be married should be made known or disclosed to the registrar. If, therefore, the parties comply with the requirements of § 46-5 and obtain a license pursuant thereto, a marriage celebrated in a foreign country in conformity with the provisions of § 46-6 will be recognized as valid.

The majority opinion incorrectly gives to § 46-6 the effect of the provisions of the Uniform Marriage Evasion Act, 9 U.L.A. 480, which was never adopted in this state. The act was approved in 1912 by the national conference of commissioners on uniform state laws. The first section provided: "If any person residing and intending to continue to reside in this state who is disabled or prohibited from contracting marriage under the laws of this state shall go into another state or country and there contract a marriage prohibited and declared void by the laws of this state, such marriage shall be null and void for all purposes in this state with the same effect as though such prohibited marriage had been entered into in this state." The act, in its entirety, was adopted in Vermont (1912), Massachusetts (1913), Louisiana (1914), Illinois (1915), and Wisconsin (1915). Handbook of National Conference of Commissioners on Uniform State Laws, p. 64 (1943). The first section was adopted in eleven other states. See Taintor, "Marriage in the Conflict of Laws," 9 Vand. L. Rev. 607, 629. The legislature must be presumed to have been aware, in 1913, of the provisions of the uniform act, yet it

did not adopt that act. Instead, it enacted § 46-6. The language of § 46-6 bears no resemblance to the language of the uniform act, and § 46-6 cannot be given effect as declaring that a marriage which was contracted in a foreign country and which would be void if entered into in Connecticut shall have no force in this state.

I do not share the view that the public policy of this state requires or warrants the result reached by the majority. The same kind of marriage was involved in *Fensterwald* v. *Burk,* 129 Md. 131, 98 A. 358, writ of error dismissed, 248 U.S. 592, 39 S. Ct. 21, 63 L. Ed. 436, and the marriage of the Maryland residents in a foreign jurisdiction was accorded recognition. The Maryland statute prohibiting the marriage of uncle and niece dates from 1777. Id., 138. The opinion notes that such a marriage is not incestuous according to the generally accepted opinion of Christendom. Beale expresses the view that such a marriage is not so offensive that the courts of the domicil will refuse to create the status if the contract was made at a place where the marriage was valid. 2 Beale, Conflict of Laws § 132.2. So, also, in *Matter of May,* 305 N.Y. 486, 114 N.E.2d 4, the New York courts accorded recognition to a foreign marriage of uncle and niece, in the face of the prohibition of such a marriage by the laws of New York, the court declaring (p. 491) that although the applicable statute made a marriage between uncle and niece incestuous and void, the statute did not by express terms regulate a marriage solemnized in another state, where the marriage was legal, and the statute's scope could not be extended by judicial construction. See *Stevenson* v. *Gray,* 56 Ky. 193, 210.

In whatever terms "capacity," under the provi-

sions of § 46-6, may be conceived, it relates to the capacity of the parties to enter into the contract of marriage. After the marriage, the relation between the Catalanos became a status, no longer resting merely on contract. *Allen* v. *Allen,* 73 Conn. 54, 55, 46 A. 242. A contract of marriage is sui generis. "It is simply introductory to the creation of a *status,* and what that *status* is the law determines. A contract executed in contravention of law may yet establish a *status* which the law will recognize, and, if one of the contracting parties were innocent of any intention to violate the law, may recognize as carrying with it in his favor the same rights and duties as if the contract had been entirely unexceptionable. *In re Grimley,* 137 U.S. 147, 152, 153 [11 S. Ct. 54, 34 L. Ed. 636]." *Gould* v. *Gould,* 78 Conn. 242, 245, 61 A. 604. Mrs. Catalano was innocent of any intent to violate our laws, and she is entitled to have recognition here of her marriage status, with all of the rights flowing from that status. The following from the opinion in *Pierce* v. *Pierce,* 58 Wash. 622, 626, 109 P. 45, aptly expresses what I conceive to be the correct view in the situation here. "We know of no public policy which will warrant a court in annulling a marriage between competent parties if there be any evidence to sustain it, and especially so where it appears that the parties have consummated the marriage, a child has been born, and the offending party has been openly acknowledged as a spouse. It will not be done unless it clearly appears that the parties willfully went beyond the jurisdiction of the courts of this state to avoid and defy our laws. It is not clear that they did so in this case."

The answer to the question in the reservation should be "Yes."