DAVID SINGH *v.* SEORANIE SINGH
(13698)

HEALEY, SHEA, GLASS, COVELLO and HULL, Js.

Argued November 2, 1989—decision released February 6, 1990

*John Antkowiak,* certified legal intern, with whom was *Keith W. Acker,* for the appellants.

*Heather J. Wilson,* assistant attorney general, with whom were *Jane S. Scholl,* associate attorney general, and, on the brief, *Clarine Nardi Riddle,* attorney general, for the state of Connecticut as amicus curiae.

ARTHUR H. HEALEY, J. This is an appeal from the trial court's denial of the plaintiff's and the defendant's motion to open the 1984 judgment of annulment of their 1983 marriage in Connecticut. We transferred this case from the Appellate Court to this court pursuant to Practice Book § 4023. We find no error.

The factual background that generates the issue to be decided is the following. The parties, David Singh (husband) and Seoranie Singh (wife), were married on January 13, 1983, in Hartford. In their complaint, seeking an annulment, they alleged that their 1983 marriage was entered into "upon the mistaken belief by both parties that they were not related," but "they [had

only] recently discovered that they are uncle and niece." There were no issue of this marriage. In 1984, the court, *Hon. Simon Cohen,* state trial referee, rendered judgment of annulment declaring the marriage null and void after finding, inter alia, that "[t]he marriage was entered into upon the mistaken belief by both parties that they were legally qualified to marry," but that "[both parties] have recently discovered that they are uncle and niece."

Thereafter, in November, 1988, both parties filed a motion to open the judgment. That motion alleged that, although the judgment found that they were uncle and niece and, therefore, not legally qualified to marry, in fact, since the wife's mother is the husband's half sister, the wife is the husband's half niece and not his niece. The parties also maintained that they sought the annulment only because of the advice of counsel that their marriage was, "without question," incestuous and void under our statutory scheme. See General Statutes §§ 46b-21,[1] 53a-191.[2] In view of the fact that our statute concerning kindred who may not marry does not mention "half nieces" or "half uncles" and no Connecticut decision extends the scope of the law's prohibition to relatives of the half blood, the parties claimed that the marriage "might well be deemed lawful and valid." They further alleged that they were remarried in August, 1988, in California where, citing *People* v. *Baker,* 69 Cal. 2d 44, 442 P.2d 675, 69 Cal. Rptr. 595

---

[1] General Statutes § 46b-21 provides: "(Formerly Sec. 46-1.) KINDRED WHO MAY NOT MARRY. No man may marry his mother, grandmother, daughter, granddaughter, sister, aunt, niece, stepmother or stepdaughter, and no woman may marry her father, grandfather, son, grandson, brother, uncle, nephew, stepfather or stepson. Any marriage within these degrees is void."

[2] General Statutes § 53a-191 provides: "INCEST: CLASS D FELONY. (a) A person is guilty of incest when such person marries a person whom such person knows to be related to such person within any of the degrees of kindred specified in section 46b-21.

"(b) Incest is a class D felony."

(1968), they assert that the California Supreme Court has determined that marriages between uncles and nieces of the half blood are not proscribed by that state's incest statute.[3]

The trial court, *Kline, J.*, denied the motion to open the judgment of annulment. In doing so, it found that the wife was the daughter of her husband's half sister and that this half sister and the husband were descended from a common mother but different fathers. It noted that while there were some Connecticut cases[4] implicating the statute, there were no Connecticut cases specifically addressing the question whether persons of the half blood fall within the statutorily prohibited degrees of whole blood relationships. Further, the trial court not only said that a number of cases in other jurisdictions indicated that marriage or sexual intercourse between an uncle and

---

[3] Despite this second marriage, the parties went on to contend in their motion to open that they would still face a "painful two year separation" unless the annulment judgment was opened. The reasons they advanced to support this latter claim of the two year delay was, they claim, due to certain amendments in November, 1986, to the Immigration and Nationality Act. The wife was a citizen of Guyana when she remarried her husband. She had been cited by the immigration authorities for exclusion as an "overstay" and was therefore precluded from applying for an "adjustment status" to permanent residency based on that marriage. Consequently, she will have to return to Guyana and cannot initiate an "adjustment status" application until she has completed two years of residence outside the United States. They emphasize in their motion that "their relationship has nothing in common with so-called 'green card marriages.'"

A "green card" is a document which evidences an alien's permanent residence status in the United States. See *United States* v. *Carpentier,* 689 F.2d 21, 23 n.5 (2d Cir. 1982).

[4] In this context, the trial court specifically referred to *State* v. *Skinner,* 132 Conn. 163, 43 A.2d 76 (1945), *Catalano* v. *Catalano,* 148 Conn. 288, 170 A.2d 726 (1961), and *State* v. *Moore,* 158 Conn. 461, 262 A.2d 166 (1969). It also referred to an opinion of the attorney general concerning the validity of a marriage between an uncle and his half niece under General Statutes (1930 Rev.) § 51-48, the precursor of the present statute, General Statutes § 46b-21. See 19 Opin. Atty. Gen. 281 (1935).

niece of the half blood could be incestuous, but also opined that the texts seemed to be uniform that both at common law and by statute prohibited degrees of relationship by blood included persons of the half blood as well as of the whole blood. The court also stated that these authorities uniformly held that there is no distinction between the whole blood and half blood in computing the degrees within which marriages are prohibited as incestuous. The trial court also concluded that not only consanguinity but also the degree of the relationship between the parties was a basis for prohibiting certain marriages. Because § 46b-21 prohibits marriages between stepparents and stepchildren, the court inferred that it was not the actual blood relationship that appeared to concern the legislature but rather the degree or distance of the relationship between the parties indicating a legislative intent to prevent not only marriages of the whole blood but also those of the half blood. The trial court accordingly denied the motion to open and set aside the judgment of annulment. This appeal followed.

The issue to be decided is whether a marriage between persons related to one another as half uncle and half niece is incestuous under our statutory scheme and, therefore, void. See General Statutes §§ 46b-21, 53a-191. The parties maintain that such a marriage is not incestuous under our statutory law. The attorney general, who appeared as an amicus curiae, argued to the contrary. The determination of this question involves the interrelation and judicial interpretation of two statutes, §§ 46b-21 and 53a-191. This case, unlike State v. Skinner, 132 Conn. 163, 43 A.2d 76 (1945), or State v. Moore, 158 Conn. 461, 262 A.2d 166 (1969), to which counsel have referred, does not come before us on appeal from a conviction of the crime of incest.

These cases, however, are instructive on the issue to be resolved in this case.[5]

Historically, marriage between certain relatives "has been disfavored by all nations during all ages." F. Keezer, Marriage and Divorce (3d Ed. 1923) § 170; 1 C. Vernier, American Family Laws (1931) § 37; 1 H. Clark, Law of Domestic Relations in the United States (2d Ed. 1987) § 2.9; see *Gould* v. *Gould,* 78 Conn. 242, 244, 61 A. 604 (1905). Although incest was punished by the ecclesiastical courts in England, it was not an indictable offense at common law and punishment was left entirely to the ecclesiastical courts. See *People* v. *Baker,* supra; *Cecil* v. *Commonwealth,* 140 Ky. 717, 719, 131 S.W. 781 (1910); *State* v. *Jarvis,* 20 Or. 437, 439, 26 P. 302 (1891); 4 Blackstone Com. 4. "The ecclesiastical courts followed the interdiction of Levitical law which prohibited marriages between persons more closely related than fourth cousins unless a dispensation was procured from the Church of Rome; no distinction was made between persons related by affinity or consanguinity." *People* v. *Baker,* supra, 49; see *Butler* v. *Gastrill,* Gilbert's Rep. 156, 156–57, 25 Eng. Rep. 110 (1721); *State* v. *Tucker,* 174 Ind. 715, 718-19, 93 N.E. 3 (1910). In 1540, during the reign of Henry VIII, a statute was passed regulating the degrees of relationship within which marriage was illegal. See 32 Henry 8, c. 38. That statute limited the prohibitions against marriage to relatives closer than first cousins, and although the ecclesiastical courts approved of the statute, the courts continued to make no distinction between relatives by consanguinity or affinity. *People*

---

[5] Counsel have also stressed our decision in *Catalano* v. *Catalano,* 148 Conn. 288, 170 A.2d 726 (1961), which was an appeal from a probate decree, that required our interpretation of three statutes, i.e., the precursors of General Statutes §§ 46b-21 and 53a-191, as well as General Statutes § 46-6 ("when marriages in foreign countries are valid," now General Statutes § 46b-28).

v. *Baker,* supra; *Butler* v. *Gastrill,* supra; *The Queen* v. *St. Giles in the Fields,* 11 Q.B. 173, 116 Eng. Rep. 441 (1847). "Consanguinity" is a blood relationship. It is the connection or relation of persons descended from the same stock or common ancestor. Black's Law Dictionary (5th Ed.). It is distinguished from "affinity" which, in turn, is the connection existing in consequence of a marriage between each of the married persons and the kindred of the other spouse. Id.; see *Lavieri* v. *Commissioner of Revenue Services,* 184 Conn. 380, 383, 439 A.2d 1012 (1981).

The initial departure of the American jurisdictions from the English law was to declare incest a crime. The crime of incest is purely statutory, and most states have a statute making it a crime. The statutes delineating incestuous relationships departed from the ecclesiastical law in two respects. The majority of states extended the criminal prohibitions to first cousins and beyond while other states imposed criminal penalties only where the relationship was that of consanguinity. *People* v. *Baker,* supra; F. Keezer, supra, §§ 171 and 172, pp. 220–22. As will be seen, Connecticut's incest statute followed the former course. While these statutes may vary in detail, they generally define incest as marriage or sexual intercourse between persons too closely related in consanguinity or affinity to be entitled to marry legally. See 72 A.L.R.2d 706.

In Connecticut, incest has been a crime since the incest statute was enacted in 1702 as part of "An Act to prevent Incestuous Marriages." General Statutes (1702–1733), p. 74; see *Catalano* v. *Catalano,* 148 Conn. 288, 290, 170 A.2d 726 (1961); *Gould* v. *Gould,* supra, 246. The 1702 act[6] prohibited marriages between per-

---

[6] "The Acts and Laws of His Majesty's Colony of Connecticut in New England, Revision of 1702" contains: "An Act to prevent Incestuous Marriages" and provides in part: "That no man shall marry any woman within the degrees hereafter named in this Act, That is to say, No man shall marry

sons within certain degrees of kinship including that of uncle and niece. *Catalano* v. *Catalano,* supra; *Gould* v. *Gould,* supra. In the 1875 revision, the language describing the degree of relationship, now appearing in § 46b-21, was adopted. General Statutes (1875 Rev.) § 1; *Catalano* v. *Catalano,* supra. There has been no substantive change in the language since that time.[7] Thus, since 1702, our incest statute has interdicted marriage between persons related by either consanguinity or affinity.

Initially, the parties claim that the trial court erred by adhering to a line of cases dating from the interpretations of the incest statute during the reign of Henry VIII[8] citing to the English statute of 32 Henry 8, c. 38. They concede that "[d]espite notable changes in sexual mores and in the very conditions which underlie the incest taboo itself, which have intervened since the time of Henry VIII, most Courts considering [the] question have been satisfied to mechanically reproduce the

his Grandfathers Wife, Wives Grandmother, Fathers Sister, Mothers Sister, Fathers Brothers Wife, Mothers Brothers Wife, Wives Fathers Sister, Wives Mothers Sister, Fathers Wife, Wives Mother; Daughter, Wives Daughter, Sons Wife, Sister, Brothers Wife, Wives Sister, Sons Daughter, Daughters Daughter, Sons Sons Wife, Daughters Sons Wife, Wives Sons Daughter, Wives Daughters Daughter, Brothers Daughter, Sisters Daughter, Brothers Sons Wife, Sisters Sons Wife, Wives Brothers Daughter, Wives Sisters Daughter; and if any man shall hereafter marry, or have carnal copulation with any woman, who is within the degrees before recited in this Act, every such Marriage shall be, and is hereby declared to be null and void; and all Children that shall hereafter be born of such Incestuous Marriage or Copulation, shall be for ever disabled to Inherit by Descent, or by being generally named in any Deed or Will, by Father or Mother." (Spelling as in original.)

[7] The legislature, however, has had the statute before it in recent years. In 1978, it changed the third word of General Statutes § 46b-21 from "shall" to "may" after the words "No man" as well as after the words "no woman." Public Acts 1978, No. 78-230, § 3. At the same time, it amended the second sentence to provide: "Any marriage within these degrees is void" instead of "and, if any man or woman marries within the degrees aforesaid, said marriage shall be void."

[8] Henry VIII (1491–1547) reigned as King of England from 1509 to 1547.

precedents of several hundred years ago." They, nevertheless, urge "a more modern approach to the construction of our incest statute" and maintain that they "rely upon a line of cases placing more emphasis on the rights of criminal defendants, and the importance of preserving bona fide marriages against the undue extension of statutory categories."[9] They claim that there are several compelling reasons for the statutory construction that they urge: (1) the plain language of § 46b-21 favors the construction allowing uncle-niece marriages between relatives of the half blood; (2) undue judicial extension of the prohibitions contained in § 46b-21 may lead to unfair prosecutions for the crime of incest under § 53a-191; (3) an unwarranted extension of the incest prohibition to include uncles and nieces of the half blood is inconsistent with proper respect for the preservation of bona fide marriages; and (4) since the prohibition of "uncle-niece marriages, especially those between relatives of half blood, are not the object of universal condemnation, the Court will not be at odds with 'natural law' if it adopts the construction [advocated] by [the parties]." We are not persuaded by any of these claims.

It is clear that § 46b-21 does not contain any language that expressly distinguishes between relatives of the whole blood and the half blood. It is also clear that although § 46b-21 is a civil statute, its interrelationship with § 53a-191, the criminal statute prohibiting incest, is such that both statutes may fairly be said to be in pari materia and so § 46b-21 is to be construed in this case in harmony with the law of which it forms a part. See *Dart & Bogue Co.* v. *Slosberg,* 202 Conn. 566, 575,

---

[9] Here, the parties refer us to three cases: *People* v. *Baker,* 69 Cal. 2d 44, 442 P.2d 675, 69 Cal. Rptr. 595 (1968); *People* v. *Womack,* 167 Cal. App. 2d 130, 334 P.2d 309 (1959); and *State* v. *Bartley,* 304 Mo. 58, 263 S.W. 95 (1924). Each of these cases is inapposite as we point out later in this opinion.

522 A.2d 763 (1987); *State* v. *Millette,* 112 N.H. 458, 465, 299 A.2d 150 (1972); 82 C.J.S., Statutes § 362 (1953). The infusion into § 53a-191 of the degrees of relationship set out in § 46b-21 as the predicate for the commission of the crime of incest invokes the rule of strict construction that is applied to criminal statutes. The United States Supreme Court has said: "That criminal statutes are to be construed strictly is a proposition which calls for the citation of no authority. But this does not mean that every criminal statute must be given the narrowest possible meaning in complete disregard of the purpose of the legislature." *United States* v. *Bramblett,* 348 U.S. 503, 509–10, 75 S. Ct. 504, 99 L. Ed. 594 (1955). The same court also said: "No rule of construction, however, requires that a penal statute be strained and distorted in order to exclude conduct clearly intended to be within its scope—nor does any rule require that the act be given the 'narrowest meaning.' It is sufficient if the words are given their fair meaning in accord with the evident intent of [the legislature]." *United States* v. *Raynor,* 302 U.S. 540, 552, 58 S. Ct. 353, 82 L. Ed. 413 (1937). We have said: "Strict construction does not mean that a statute must be read in isolation. ' "In construing a statute, common sense must be used, and courts will assume that the legislature intended to accomplish a reasonable and rational result." ' . . . ' "The rule of strict construction does not require that the narrowest technical meaning be given to the words employed in a criminal statute in disregard of their context and in frustration of the obvious legislative intent." ' " (Citations omitted.) *In re Luis R.,* 204 Conn. 630, 635, 528 A.2d 1146 (1987). Such authority demonstrates that the rule of strict construction of penal statutes is not without limitation; the doctrine of strict construction is only one of the aids which is to be used in the construction of penal statutes. See 3 J. Sutherland, Statutory Con-

struction (4th Ed. 1986) § 59.06. Other aids include such things as the statutory language itself, legislative history where available, the furthering of the policy and purposes fairly apparent from the statute which include the mischief sought to be proscribed and related statutes.

In our analysis, it is proper to explore further the state of the law as it was at the time that our incest statute was enacted in 1702. The fundamental case explicating the ecclesiastical law as it was deemed at the time was *Butler* v. *Gastrill,* supra. That case, which was decided in 1722, said: "And when we consider who are prohibited to marry by the Levitical Law,[10] we must not only consider the mere Words of the Law itself, but what, from a just and fair Interpretation, may be deduced from it." Id., 158. On the basis of early English cases discussing the prohibition of marriage within certain degrees, Halsbury said: "In reference to the prohibited degrees, relationship by the half blood is a bar to marriage equally with relationship by the whole blood." 16 Halsbury's Laws of England p. 284. Another noted text writer wrote: "The relationship by half blood is the same in [the consanguinity cases] as by whole blood; so that, for example, it is incestuous for a man to marry the daughter of his brother of the half blood, or the daughter of his half-sister." 1 J. Bishop, Marriage, Divorce and Separation § 748. It is fair to assume that, when the incest statute was enacted in 1702, the framers were aware of and adopted the interpretation of the ecclesiastical law as it then existed in England,

---

[10] "A fair interpretation" of the statute of 32 Hen. 8, c. 38 has been said to forbid marriage outside the Levitical degrees. 1 J. Bishop, Marriage, Divorce and Separation (1891) § 737; see 1 J. Schouler, Husband and Wife (1882) § 15. The Levitical degrees are those degrees of kindred between a man and a woman which bar their marriage to each other as those degrees are set forth in the eighteenth chapter of Leviticus. Black's Law Dictionary (5th Ed.); Ballentine's Law Dictionary (1969).

thus treating the relation of the half blood like that of the whole blood. See *Commonwealth* v. *Ashey,* 248 Mass. 259, 42 N.E. 788 (1924); 1 J. Schouler, Marriage, Divorce, Separation and Domestic Relations (6th Ed.) § 756.

There has been no substantive change since that time in our incest statute insofar as the degree of consanguinity within which marriage is proscribed. That is not without significance. Indeed, implicating the issue before us, in 1961, we said: "It has been the declared public policy of this state continuously since 1702 to prohibit marriages of uncle and niece and declare them void." *Catalano* v. *Catalano,* supra, 290. Our decisional law under the incest statute has been sparse. In *Catalano,* we held invalid a marriage between an uncle and a niece under our statutory scheme although the marriage was valid in Italy where it was performed. In that case, we noted that the "generally accepted rule" was that a marriage valid where the ceremony was performed was valid everywhere. Id., 291. We pointed out, however, that there were certain exceptions to the rule, including one which regarded as invalid incestuous marriages between persons so closely related that their marriage was contrary to the strong public policy of the domicil. Id. In that context, we said: "That exception may be expressed in the terms of a statute or by necessary implication." Id.

Besides *Catalano,* two other cases merit discussion. In *State* v. *Skinner,* 132 Conn. 163, 43 A.2d 76 (1945), we held that the relationship of brother and half sister was comprehended within the degrees of relationship forbidding marriage under the incest statute. In that case, we rejected the defendant brother's claim that the relationship of half sister did not come within the statutory prohibition. Id., 165. In doing so, we pointed out that the defendant "admitted in his brief that all the cases which [his counsel] have found are to the con-

trary and that public policy would indicate that relationship of the half blood should be included in the prohibition of the incest statute." Id. After referring to several cases from other jurisdictions that directly held that "brother" includes a brother of the half blood and that "sister" includes a sister of the half blood, we said: "In view of the purpose of the statute . . . its language, and the soundness of the decisions we have cited, we hold that the word sister, as used in the statute, applies to and includes a half sister."[11] Id.

In *State* v. *Moore,* 158 Conn. 461, 464, 262 A.2d 166 (1969), the defendant had been found guilty of incest[12] where the parties involved were the defendant and the nineteen year old daughter of the defendant's brother-in-law, that is, the daughter of the defendant's wife's brother. In reversing the incest conviction in *Moore,* we observed that the trial court "extended the meaning of § 46-1 (now § 46b-21) beyond its fair import." Id., 465. In doing so, we referred to *Skinner,* pointing out that the relationship in that case contained the element of consanguinity and we also noted that that element appeared in all the relationships enumerated in § 46-1 (now § 46b-21) except the relationship of stepmother or stepdaughter and stepfather or stepson. Id., 466. *Moore* then goes on to say: "The question at once

---

[11] Long ago, albeit in a different context (the construction of a statute as to who would take in the event of a "lapsed" devise or legacy under a will) the only issue was whether the word "brother" or "sister" as used in that statute included half brothers. *Seery* v. *Fitzpatrick,* 79 Conn. 562, 65 A. 964 (1907). In *Seery,* we said: "In England it has long been settled that whenever the word 'brother' or 'sister' is used in a statute without limitation [as in the statute in *Seery*], it includes half-brothers or half-sisters respectively." Id., 563.

[12] General Statutes § 53-223, at the time of *State* v. *Moore,* 158 Conn. 461, 262 A.2d 166 (1969), provided: "Every man and woman who marry or carnally know each other, being within any of the degrees of kindred specified in section 46-1, shall be imprisoned in the State Prison not more than 10 years."

arises as to why, in its enumeration of relationships which do not include the element of consanguinity, the General Assembly saw fit to include only those of step-parent or a stepchild. In the application of the criminal law, it would be an unwarranted extension and presumption to assume that by specifying those relationships the legislature has intended to include others which lack the element of consanguinity. Had the legislative intent been to include what, in this case, would commonly be called a relationship of niece-in-law and uncle-in-law, it would have been a simple matter to say." Id. Therefore, the *Moore* court opined that, absent such a declaration, the trial court's construction "amounted to an unwarranted extension of its expressed meaning and intent." Id.

The parties stress that *Moore* is very supportive of their position. We do not agree for several reasons. First, the fact pattern in *Moore* was different from that in both *Skinner* and *Catalano,* as in the latter two cases, unlike *Moore,* a blood relationship was involved. Second, in *Moore,* we referred to *Skinner,* noting that, in *Skinner,* we not only pointed out that the relationship in that case "is embraced within the meaning of the statute" but also that in that relationship there was the element of consanguinity. *State* v. *Moore,* supra. In *Moore,* the element of consanguinity was absent but that of affinity was present. Moreover, in *Moore,* we did not qualify our holding in *Skinner* but acknowledged its viability. Finally, in *Moore,* we were not called upon to decide whether the statute proscribed marriage between two persons where *each* was a relative of the half blood although *Skinner,* fairly read, was a step in that direction.

Nor do we overlook, in reaching our conclusion, those cases that the parties urge us to rely upon in reaching "a more modern approach" to the construction of our incest statute. This approach, they claim, is one which

places more emphasis on the rights of criminal defendants as well as "preserving bona fide marriages against the undue extension of statutory categories." They cite the following cases: *People* v. *Baker,* supra; *People* v. *Womack,* 167 Cal. App. 2d 130, 334 P.2d 309 (1959); and *State* v. *Bartley,* 304 Mo. 58, 263 S.W. 95 (1924).

The parties place the greatest stress on *People* v. *Baker,* supra. A close reading of that case demonstrates that it is clearly inapposite. That case was an incest prosecution against Baker who had had sexual relations with his niece who was related to him by the half blood; that is, her mother was the defendant's half sister. The trial court found him guilty of incest. His principal claim on appeal was that the prohibition in California Penal Code § 285[13] against fornication by an uncle and his niece did not apply where they were related by the half blood. That statute provided in part: "Persons being within the degrees of consanguinity within which marriages are declared by law to be incestuous and void . . . who commit fornication . . . with each other . . . are punishable by imprisonment . . . . " California Civil Code § 59 provided: "Marriages between parents and children, ancestors and descendants of every degree, and between brothers and sisters *of the half as well as the whole blood,* and between uncles and nieces or aunts and nephews, are incestuous, and void from the beginning, whether the relationship is legitimate or illegitimate." (Emphasis added.) The *Baker* court reversed the conviction. In doing so, it reasoned that the phrase "of the half as well as the whole blood" obviously referred to brothers and sisters and could not

---

[13] California Penal Code § 285, which was enacted in 1872 and amended only in 1921, provided at the time of *People* v. *Baker,* 69 Cal. 2d 44, 442 P.2d 675, 69 Cal. Rptr. 595 (1968), as follows: "Persons being within the degrees of consanguinity within which marriages are declared by law to be incestuous and void, who intermarry with each other, or who commit fornication or adultery with each other, are punishable by imprisonment in the state prison not less than one year nor more than fifty years."

be interpreted also to modify "uncles and nieces" under established tenets of statutory construction. Moreover, by including relationships between brothers and sisters of the half blood and not so specifying as to more distant relatives, the *Baker* court reasoned that the legislature evinced the intention to exclude such persons from the statutory prohibition. *People v. Baker,* supra. In recognizing that various state statutes differ, it acknowledged that the more common type of statute extended the prohibition to uncles and nieces of the half blood even where half blood relationships were not mentioned.[14] The manifest dissimilarity of the California statute in *Baker* from our statutes affords little support for the claims of the parties in this case. Indeed, *Baker* itself expressly points this up when, after stating that incest is governed by specific statutes in the various states, it says that "the relevant decisions must be considered in the context of the statutory scheme peculiar to the particular state." Id., 47. We agree.

The *Baker* court addressed the earlier case of *People v. Womack,* supra. *Womack* posed the question whether an admitted act of sexual intercourse between the defendant Womack and the fourteen year old daughter of his half sister was incestuous under the same statutory scheme that existed in *Baker.* The California Court of Appeals had affirmed Womack's conviction of incest. In doing so, it construed the statutory scheme to include the defendant and the victim

---

[14] As to that, the court in *People v. Baker,* 69 Cal. 2d 44, 47, 442 P.2d 675, 69 Cal. Rptr. 595 (1968), said: "More commonly, the statute condemns various relationships without specifying the 'wholeness' of the blood as to any of them. In all reported decisions construing such a statute, the courts have extended its bans to uncles and nieces of the half blood by reasoning that 'uncle' in ordinary usage of the word includes a person of the half blood, and/or that under other statutes, relatives of the half blood are given the same legal status as those of the whole blood. . . . Either rationale is inapposite where the statute, as is true of Civil Code section 59, specifically deals with some half blood relations and not with others." (Citations omitted.)

within those degrees of relationship between whom sexual intercourse was prohibited. In its decision, it observed that "[b]y definition, an uncle is a brother of one's father or mother, and no distinction is made between the whole and the half blood according to common and ordinary usage." *People* v. *Womack,* supra, 131. *Baker* not only referred to *Womack* but expressly "disapproved" of it as "being inconsistent with fundamental canons of construction of criminal statutes." Therefore, *Womack* hardly supports the parties in the case before us. Rather significantly, however, the *Baker* court explicitly did say: "Undeniably, the great weight of authority is in accord with the result reached in *Womack.* (Note, 72 A.L.R. 2d 706)" and conceded that those decisions which represented the weight of authority were consonant with the English ecclesiastical law declaring a marriage between an uncle and niece of the half blood incestuous. *People* v. *Baker,* supra, 47.

Finally, the parties refer us to *State* v. *Bartley,* supra, but that Missouri incest decision hardly buttresses their claim. The defendant Bartley, who had been convicted in the trial court, was a half brother of the mother of the young woman with whom he had had sexual intercourse, the relationship being that of uncle and niece of the half blood. The Missouri statute defining incest provided in part: "Persons within the following degrees of consanguinity, to wit: Parents and children, including grandparents and grandchildren of every degree, *brothers and sisters of the half as well as of the whole blood, uncles and nieces,* aunts and nephews, who shall intermarry, or who shall commit adultery or fornication . . . shall be adjudged guilty of incest . . . ." (Emphasis added.) Id., 61. In reversing the conviction, the Missouri Supreme Court adopted a strict construction of the statute against the state saying, inter alia, that "[n]o one is to be made subject to such statutes by implication" and "[w]here one class of persons is

designated as subject to its penalties, all others not mentioned are exonerated." Id., 63. That case effectively held: "When the Legislature mentioned brothers and sisters of the half blood it necessarily excluded all other relationships of the half blood." Id. Again, as in *Baker* and *Womack, Bartley* involved a statutory scheme quite dissimilar from ours. Each involves statutes that expressly provide for certain relationships of the half blood; ours does not.

In addition, the parties suggest that holding marriages between uncles and nieces of the half blood valid will place more emphasis on the rights of criminal defendants and the importance of preserving bona fide marriages against the undue extension of statutory categories. At the outset, we should point out that in this appeal there are no claims that the statutory scheme involved is unconstitutional. Moreover, this appeal does not come to us as a criminal matter. We are, therefore, disinclined to give any opinion, without any factual predicate, what effect upholding the parties' "more emphasis on the rights of criminal defendants" claim; because to do so would amount to an advisory opinion. Also, on that branch of their claim, we point out here, as we did in *Lomas & Nettleton Co.* v. *Waterbury,* 122 Conn. 228, 234, 188 A. 433 (1936), that "[l]aw suits are not determined by a consideration of philosophy in the abstract, but by the application of legal principles to the facts of a particular case."

Connecticut has its statutory scheme in place to implement its policy of delineating the relationships between persons under our jurisdiction who may properly enter into marriage. It has been for many years and still remains the declared public policy of the state. See *Catalano* v. *Catalano,* supra. The degrees of relationship within which marriages are prohibited are not, from what we have already said, words of art. Fairly read, the prohibition against intermarriage of those

related by consanguinity can be understood to extend to those of the half blood as well as of the whole blood. In *Skinner,* which predated the case before us by a generation, we held that the words "brother" and "sister" included those of the half blood. "According to the common meaning of the word ['uncle'], it includes the half-brother of the [mother] and there is no distinction between the whole and half blood." 90 C.J.S. 1025. We believe that the same can be said of the term "niece," that is, that it comprehends the half blood as well as the whole blood. In doing so, we accord to each word its common meaning without frustrating legislative intent but rather enhancing it. Other courts have had no difficulty concluding that their statutes, although silent on the half blood matter, comprehend that relationship in "uncle-niece" incest cases. See, e.g., *State v. Lamb,* 209 Iowa 132, 227 N.W. 830 (1929); *Commonwealth v. Ashey,* supra, 260. In giving a statute its full meaning where that construction is in harmony with the context and policy of the statute, "there is no canon against using common sense in construing laws as saying what they obviously mean." *Roschen v. Ward,* 279 U.S. 337, 339, 49 S. Ct. 336, 73 L. Ed. 722 (1929); *Donnelly v. United States,* 276 U.S. 505, 48 S. Ct. 400, 72 L. Ed. 676 (1928). We will attempt no encompassing definition of a "bona fide marriage" in the incest context. The parties have advanced none. We submit, however, that, given the common meaning of uncle and niece, as we have discussed it, what would constitute a "bona fide marriage" in the incest context should be decided on a case-by-case basis against the background of authority we have set out above. Therefore, contrary to the parties' claim, our interpretation of the statutory scheme does not constitute an "unwarranted extension" of the incest prohibition that "is inconsistent with proper respect for the preservation of bona fide marriages."

In conclusion, a marriage between persons related to one another as half uncle and half niece is void under General Statutes §§ 46b-21 and 53a-191 as incestuous.[15]

There is no error.

In this opinion the other justices concurred.

[15] The fact that the General Assembly has expressly provided in 1987 that "[r]elatives of the half blood shall take the same share under [General Statutes § 45-276, entitled 'Distribution when there are no children or representatives of them'] is not in conflict with this conclusion. The 1987 statute, Public Acts 1987, No. 87-239, entitled "An Act Concerning Discrimination Between Relatives of the Whole and Half Blood," was enacted for a limited purpose. It did purport to affect the affairs of relatives in only a limited manner—to prevent discrimination between relatives of whole and half blood under our inheritance law where there are no children or representatives of them. That purpose does not implicate the issue we decide on this appeal.